THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* GEORGE McNASPIE, Appellant.

Third Department, April 30, 1941.

*Henry A. Lowenberg,* for the appellant.

*John T. Delaney, District Attorney [Henry S. Kahn, Assistant District Attorney,* of counsel], for the respondent.

HILL, P. J. The defendant appeals from a judgment of conviction of robbery in the first degree. There was evidence sufficient to sustain the conviction. Appellant asserts that a new trial should be granted because of two prejudicial incidents. The trial began in the morning of June 3, 1940, the jury being sent out June fifth at five-twenty in the afternoon, the verdict of guilty returned on the following morning at nine-fifty. The appellant and a defendant indicted with him, Anthony Rosano, were being tried together. On the second day of the trial, closely following the evidence given by an alleged co-conspirator of the appellant and Rosano, the attorney for the latter, in the presence of the jury, stated: " If your Honor please, at this time and on my recommendation, the defendant Rosano wishes to withdraw his plea of not guilty and throw himself upon the mercy of the Court and enter a plea of guilty to the indictment as charged." Whereupon the usual statement of a convicted criminal was taken and sentence deferred by the court. The attorney for the appellant moved for a mistrial and stated in part: " I submit that shouldn't be done in the presence of the jury because it is highly prejudicial and inflammatory here. * * * We have started this trial with both defendants; now the co-defendant offers to take a plea in the presence of the jury. Your Honor has accepted the plea in the presence of the jury. I submit that a prejudicial atmosphere has now been created," to which the court replied, " I didn't know that he was going to plead until it was all done." It was then asserted, and not denied, that the district attorney knew in advance of the proposed

change of plea.  The court denied the motion for a mistrial. Rosano was later sworn as a witness for the People.  It is argued that no error was committed, that had the change of plea been made outside the court room, his absence from the trial and subsequent testimony would have given them the information.   Doubtless the happening in the presence of the jury did create a sentiment unfavorable to the theory of appellant's innocence.

The second assignment of error is more serious.  It has to do with colloquies between counsel, the court and several jurors. The jury had remained in their rooms from five-twenty in the afternoon until three-ten the next morning, when they were brought into court and asked if they had agreed upon a verdict.  Juror No. 1 said: " We have not; we can't agree.  * * *  Your Honor, it seems to be an impossibility to reach an agreement." Juror No. 4: " It is impossible; if we stayed for a week and a half, it wouldn't be any different."  The court directed that the jury retire and deliberate a while longer.  They were returned again at seven-seven A. M., and, in answer to an inquiry if they had agreed, the following occurred:

" Juror No. 1: Your Honor, we are still unable to agree upon a verdict and I would ask —  The Court: Do you want any instructions?  Juror No. 1: I would ask the Court to allow one of the jurors to address you a moment.  The Court: All right.  Juror No. 11: Your Honor, we have been up there a pretty long time, you will grant us, and I would respectfully ask, that when you are ready to dismiss us, for permission to address you and the District Attorney.  The Court: I am not convinced of the impossibility of your agreeing, or the hopelessness of it, and I think I will send you out to breakfast; a little fresh air will do you good.  Juror No. 11: Your Honor, it is absolutely useless; I have nothing constructive to offer, and I am quite sure I am speaking for eleven jurors.  Juror No. 8: Go ahead and tell him.  The Court: Oh, no; you can speak to me right from there.  Juror No. 11: We started balloting approximately six o'clock last night; as a matter of fact, there hasn't been any change in the ratio of the voting for or against the defendant and we have discovered — now this may not be proper —  The Court: I don't think it is proper until you are discharged.  Mr. McGuiness: Just a minute.  The Court: You indicate —  Mr. McGuiness: He is trying to give his reasons. The Court: You indicate the ratio of your voting is that you might still agree?  Juror No. 11: There isn't a possibility in the world, Judge.  The Court: That is what you think.  Juror No. 11: We are sure of that.  Juror No. 3: We have done everything up there and we can't agree.  The Court: I have known juries to be out

much longer than you have and they felt the same as you do at this stage. Juror No. 4: You can't change a woman's mind, can you? "

The court then directed the jury to return to their rooms and discuss the evidence to ascertain if they were not able to reach a verdict. They were returned into court again at nine-ten A. M. when, after juror No. 1 had stated they were unable to agree upon a verdict, the following took place: " Juror No. 11: Your Honor, Judge, the condition is practically the same as it was the last time we were down here and I am still making the same request that, if and when you see fit to dismiss us, I would like to see both you and the District Attorney to consult with you. Juror No. 4: Personally, Judge, I think we are farther away from this thing than we have been before. We have been on one question sixteen hours and we can't get one answer to the question. Personally, I think we ought to have a doctor up there to have the party examined. Sixteen hours on one question and we cannot get it answered. Juror No. 11: It might be a mental condition. Juror No. 4: Now there is no end to this thing. The Court: Is it the unanimous opinion of everybody on the jury that it is absolutely hopeless that you will arrive at a verdict by further consideration? Juror No. 4: It is absolutely hopeless. Juror No. 11: Yes. Juror No. 1: Yes. The Court: In other words, you all feel that way about it, do you? Juror No. 8: Yes, Judge. Juror No. 4: Absolutely. Juror No. 11: Absolutely. Mr. Lowenberg: May I move for the discharge of the jury, Judge. The Court: Are you willing that they should be discharged, Mr. McGuiness? Mr. McGuiness: Well, it is a terrible shame and expense to the County, but there doesn't seem to be anything else for us to do; it is a terrible shame in view of the great sum of money it has cost the County and what it will cost to try it again. The Court: Well, I don't want to be unreasonable with them. Juror No. 4: There is either one who is crazy or eleven who are crazy. Juror No. 11: We feel we should stay here if by staying here we could decide it, but there is a woman on this jury who has seven children and I myself live in the country and I have a family and these people all have families and they should be taken care of; now we are perfectly willing to stick here until it is carried out. The Court: If you feel that way about it, why I am willing that you should stick longer; if you feel that way. Juror No. 11: We still feel regardless of the time spent we can't reach a decision. Juror No. 7: Absolutely impossible. Juror No. 4: Deadlocked; but that doesn't justify the set up."

The court then discussed the duty of jurors to be tolerant of arguments and concluded by saying; " I am going to give you just one

more chance. Juror No. 4: May I say a word, please? The Court: Yes. Juror No. 4: We have been on this question for sixteen hours and we have tried to get her mind open and we can't get it open. The Court: You don't want to watch the clock; you know, only last year, another Court in this building kept a jury out much longer on a less important case. Juror No. 4: We can't get this party to believe the testimony. I think she is a mental case. The Court: I am going to give you just one more chance and I am not going to keep you here very long. Juror No. 4: Give us some idea, Judge; about another hour? The Court: Yes; go up and see what you can do now; one more chance. Juror No. 8: She is sick. Juror No. 4: She ought to have a doctor, a doctor; she threw up all over the place up there. Juror No. 5: No, I am not sick."

The jury retired and twenty minutes later agreed. It is obvious that the jury stood eleven to one; that Juror No. 5, a woman, favored an acquittal.

Chief Judge PARKER, writing for the court in *People* v. *Sheldon* (156 N. Y. 268), quoting from a Michigan case, said: " 'Every attempt to drive men into an agreement which they would not have reached freely is a perversion of justice ' " (p. 279), and from Mr. Justice BREWER in a Kansas case, " ' No juror should be induced to agree to a verdict by a fear that a failure to so agree would be regarded by the public as reflecting upon either his intelligence or his integrity.' " In *People* v. *Faber* (199 N. Y. 256) the opinion cites many of the cases mentioned in *People* v. *Sheldon* (*supra*) and states the following: " It must not be overlooked that jurymen act as individuals and they must decide a case upon their own opinion and their own judgment and not merely acquiesce in the conclusions of others."

Here, the length of time which the jury was required to deliberate was not unreasonable. Nothing which the judge said is subject to criticism, but his omission to prevent the coercion, or to negative the threats obviously directed at the woman juror No. 5, was error. The request by juror No. 11, both at the seven-seven and the nine-ten interviews with the court that when the jury was finally discharged he desired to have opportunity to talk with the court and the district attorney, coupled with the other remarks, carried a sinister suggestion as to the conduct of the non-agreeing juror, as did the statements that she was crazy, a mental case, and required a doctor. All these statements made in a public court room were coercive and tended to lead the juror to consider her personal safety and reputation instead of giving attention to the issues which she was to assist in deciding. It would have been improper for the district attorney in his summation to have said that a failure to agree would be " a terrible shame and expense to the

County;" that a disagreement would be " a terrible shame in view of the great sum of money it has cost the County and what it will cost to try it again," and it was equally so at the time it was said. It is no answer that all of the offending remarks, except that by the prosecutor, were by jurors. They were made at a session of the court, whereat the county judge was presiding and it was his duty to prevent others from threatening or attacking the minority juror, to rebuke those who made the remarks quoted, and to restate the rules as to the rights and duties of individual jurors.

The defendant did not have a fair and impartial trial, and the judgment of conviction should be reversed on the law, and a new trial ordered.

CRAPSER and HEFFERNAN, JJ., concur, HEFFERNAN, J., in a separate memorandum; FOSTER, J., dissents in a memorandum, in which SCHENCK, J., concurs.

HEFFERNAN, J. (concurring). It is strenuously argued in support of the judgment of conviction that defendant is guilty. All we know or can know is that a jury has so found. On this appeal our function is to determine whether or not that judgment is tainted with legal error.

The principal error assigned for a reversal of the judgment is the contention that the jurors were coerced in the rendition of their verdict. The basis of this claim is fully outlined in the opinion of Presiding Justice HILL and it is unnecessary to repeat what is there said.

It is of paramount importance that every defendant should be accorded a fair trial irrespective of the question of his guilt or innocence. The essential and substantive attributes or elements of a jury trial are, and always have been, number, impartiality and unanimity. The latter element, however, is no longer necessary in a civil action. A verdict should express the deliberate judgment of the jury. The juror as well as the judge has an independent duty to perform and he ought to be left free to pronounce his own conviction. A verdict brought about in any other way cannot be the result of that deliberation which the law requires.

The proceedings which culminated in this verdict are highly reminiscent of the rule of the ancient common law when jurors were kept together as prisoners of the court until they had agreed upon their verdict. It was regarded not only proper, but requisite, that they should be coerced to an agreement upon a verdict. (*People* v. *Sheldon*, 156 N. Y. 268.) In Jones' Blackstone's Commentaries (Book III, pp. 1985, 1986) it is said: " The jury, after the proofs are summed up, unless the case be very clear, withdraw from the bar to consider of their verdict, and, in order to avoid

intemperance and causeless delay, are to be kept without meat, drink, fire or candle, unless by permission of the judge, till they are unanimously agreed   *   *   *   and it has been held that if the jurors do not agree in their verdict before the judges are about to leave the town,   *   *   *   the judges are not bound to wait for them, but may carry them around the circuit from town to town in a cart."

The old rule of the common law permitting coercion of a jury in order to secure a verdict has been swept away and under our present method the independence of a jury is respected.   A verdict cannot now stand where the jury has been subjected to any statements or directions naturally operating to coerce or threaten them to reach an agreement, whether the coercive acts or statements originate with the judge, or are traceable to the bailiff, or other officers of the court or to the party to the action, or to the spectators or strangers at the trial.   (16 R. C. L. p. 297.)

It has been held again and again improper for the trial court to make statements to the jury which reflect on their honesty, integrity or intelligence as jurors.   (*People* v. *Sheldon, supra; People* v. *Dixon,* 118 App. Div. 593; appeal dismissed, 190 N. Y. 540; *People* v. *Mayer,* 132 App. Div. 646; *Twiss* v. *Lehigh Valley R. R. Co.,* 61 id. 286; 64 C. J. 1049.)

No juror should be influenced to a verdict by fear of personal criticism, possible disgrace or pecuniary injury.   No juror should be induced to assent to a verdict by a fear that a failure to agree would be regarded by the public as reflecting on either his intelligence or his integrity or as a failure to properly perform a public duty. Personal consideration should never be permitted to influence a juror's conclusion.   (*Sharp* v. *State,* 115 Neb. 737; 214 N. W. 643; *State* v. *Bybee,* 17 Kan. 462.)

In this case it is apparent that eleven of the jurors were in favor of a guilty verdict.   Practically all the members of the jury repeatedly advised the court that an agreement was impossible. Despite that information the trial court directed them to reconsider the evidence.   In the colloquy between the court and the jurors the dissenting juror was charged by her associates with being insane, that she was sick, that she needed medical attention and that being a woman her mind could not be changed.   That this juror was ridiculed and criticized publicly in the presence of her associates and the presiding judge is obvious.

The susceptibility of jurors to the influence of the presiding judge should prompt the latter to emphasize the thought in his charge and in his comments in language that cannot be misunderstood that no juror should surrender his conscientious convictions for the purpose of reaching a verdict.   I have no word of condem-

nation of the spoken word of the judge in this case. My criticism is based on the fact that the dissenting juror was publicly ridiculed and criticized and her mentality questioned without any word of admonition or rebuke from the lips of the presiding judge. In fact one of the jurors suggested to the judge that when the case was over he would like an opportunity to talk to him and the district attorney about the condition of the juror in question. Who can doubt that all this operated as a threat on the mind of this juror? It is entirely probable that she finally surrendered her convictions in order to reach an agreement and to escape the humiliation of further proceedings. It would have required great fortitude on the part of any juror to withstand further criticism for persistence in his view.

In defense of this it is said that jurors frequently quarrel among themselves over the determination of questions of fact. Except in very rare instances there is no proof before the court as to what transpires in the jury room. Here we have definite evidence in open court of the coercive measures adopted to force this juror to acquiesce in the view of the majority. It is too great a strain upon our credulity to say that she was not coerced.

The Supreme Court of Florida (*City of Miami* v. *Bopp*, 117 Fla. 532; 158 So. 89) approved an order setting aside a verdict where the foreman of the jury threatened one of his associates. In that case the court held that in setting aside a verdict and granting a new trial it might properly consider an affidavit of a juror to the effect that he was of the opinion that the opposite verdict should have been rendered but consented to the returning of the verdict because of threats of the foreman of the jury that otherwise he would report to the judge the fact that the juror had read a newspaper account of the case and that this would cause trouble to the juror. In its opinion in that case the court said:

" It is true, as a general rule, on the ground of public policy that the affidavit, deposition or statement of a juror will not be received to impeach his own verdict, but this Court has heretofore recognized exceptions to that rule and especially that exception which is generally recognized by the courts of this country.

" In *Linsley* v. *State* (88 Fla. 135; 101 So. 273) we said:

" ' It is upon grounds of public policy that the rule is observed that the affidavit, deposition or statement of a juror will not be received to impeach his own verdict; but this rule relates to matters resting in the personal consciousness of the juror, as said by Mr. Justice BREWER in *Perry* v. *Bailey* (12 Kan. 539). When a juror is heard to impeach his own verdict because of some matter resting in his own consciousness the power is given to him to nullify the expressed conclusions under oath of himself and eleven others.

The general rule is that affidavits of jurors are admissible to explain and uphold their verdict, but not to impeach and overthrow it. But this general rule is subject to this qualification, that affidavits of jurors may be received, for the purpose of avoiding a verdict, to show any matter occurring during the trial, or in the jury room, which does not essentially inhere in the verdict itself.' See *Perry* v. *Bailey* (*supra*).

" The rule is general, with but few exceptions if any that the testimony of jurors will not be received to impeach their verdict. (See *Bartlett* v. *Patton*, 33 W. Va. 71; 10 S. E. 21; 5 L. R. A. 523, and note; 27 R. C. L. 896.)

" The rule announced in the Kansas case seems to us to be a salutary one and more consistent with reason and sound policy. That rule, as announced by Mr. Justice BREWER, is that all those matters lying outside the personal consciousness of the individual juror, those things which are matters of sight and hearing, and therefore accessible to the testimony of others and subject to contradiction, the interests of justice will be promoted and no sound public policy disturbed if the secrecy of the jury box is not permitted to be the safe cover for the perpetration of wrongs upon parties litigant. If the jury has been guilty of no misconduct, no harm has been done by permitting their testimony to be received. If the jury has been guilty of misconduct but such misconduct was not of such a nature as to prejudice the rights of the parties, the verdict should stand, but the offending juror should be punished. But if such misconduct has wrought prejudice not only should the juror be punished but the verdict should also be set aside; but matters resting in the personal consciousness of one juror should not be received to overthrow the verdict, because being personal it is not accessible to other testimony."

In the case before us the threats were not made in the privacy of the jury room but in open court. We are not dependent upon proof by affidavit as to what occurred. We have before us the official record.

For these reasons the judgment of conviction should be reversed and a new trial granted.

FOSTER, J. (dissenting). We are asked to set aside a verdict convicting the defendant of the crime of robbery in the first degree upon the grounds that one of the jury was coerced into rendering the verdict, of prejudicial remarks made by the district attorney, and a plea of guilty by a codefendant taken during the course of the trial. The claim of coercion is based upon the colloquy between the court and various members of the jury when it was

reported that they were unable to agree. This is set forth in full in the opinion of the presiding justice.

It is not asserted that the trial judge said anything improper, or acted coercively, but rather that he failed to say enough, the theory being that he should have protected the dissenting juror and rebuked those who made the offensive and disparaging remarks concerning this juror. The remarks complained of were offensive in that they cast aspersions on the mental capacity of the juror, and doubtless should not have been made. But this, however, is the counsel of perfection, and the final result of a trial ought not to be disturbed merely because some jurors became garrulous and offensive. It is doubtful here whether anything said by way of rebuke would have made the jury room thereafter a place of more sweetness and light.

It is a matter of common knowledge among those familiar with jury trials that jurors in the heat of discussion frequently quarrel and bicker among themselves over the determination of questions of fact, and it requires no strain on credulity to believe that on such occasions some jurors may indulge in discourteous reflections on the mental abilities of others. Lapses of this character in decorum are not confined to juries alone. They are not unknown to other deliberative and determinative bodies, for instance courts and Legislatures.

If the remarks complained of had taken place in the jury room they would not have constituted sufficient ground for reversal, if we had power to review them at all, which may be seriously doubted. Under such circumstances I think we would be bound to hold that they did not amount to coercion. Does the fact that they took place in open court change the situation so as to make them coercive? I think not. While the trial judge rebuked no one, he did state patiently and clearly the duties of jurors in the consideration of evidence, and he made no appearance of acceding to the request of one juror for an audience with him and the district attorney after the jury was discharged. Certainly he made no coercive remarks. For all we know the dissenting juror may have theretofore refused to discuss the evidence at all, in fact the remarks of other jurors rather point to that conclusion. In any event we ought not to assume that she did not understand the final instructions given, or in the face thereof she was so fragile minded that offensive remarks by other jurors frightened her into acquiescence. It should be remembered that she had a right to change her mind at any time, and it seems to me that if a finding of coercion is to be made it should be made only upon strong and convincing proof and not merely by way of inference from the remarks of angry and garrulous jurors. In this connection it should be considered

also that an appreciable period of time elapsed, not long to be sure but still appreciable, after the jury finally left to deliberate and before a verdict was returned. As to what may have happened in this interval we have no knowledge.

The remark of the district attorney as to the expense involved was quite evidently made under the assumption that the jury was then about to be discharged for failure to agree. I agree that it would have been an improper argument if made in the summation, but I do not think that it would have been so prejudicial as to require reversal. It was directed merely to an agreement, not to a conviction. Indeed, the whole colloquy involved concerns the question of agreement, nothing else. Of course, an agreement was desirable in this case as in every other case, and equally, of course, the expense attendant upon a disagreement is undesirable. These are matters known to every one and it does not necessarily follow that a statement of this bald truth improperly influenced the jury.

I also fail to see anything of substance to the argument that the plea of the codefendant, taken during the trial, was prejudicial error. Unquestionably the defendant had the right to change his plea at any time. The People also had a right to use him as a witness, and then, of course, his conviction by plea was bound to be revealed. In the first instance the People had the right to try the defendants together, unless for sufficient reason an order of severance had been made, and it would seem preposterous to hold that if one defendant desired to change his plea after the trial had commenced a mistrial had to be directed in order to take such plea.

Finally I think the evidence is conclusive as to the defendant's guilt, and in this connection I am not impressed with the argument that we may not consider the evidence upon the issues presented upon this appeal. It has, in my judgment, quite some bearing on the claim of coercion for it tends to explain the aspersive attitude of some of the jurors. It indicates, I think, that this attitude had its origin in the refusal of the dissenting juror to consider the evidence at all. In other words, I think the evidence is revealing on the question of whether the dissenting juror was the victim of coercion or whether she had merely stubbornly declined to discuss the evidence at all or open her mind to any argument. Whether this is so or not, I do not think that coercion within the meaning of any authority has been established. I, therefore, dissent and vote to affirm the conviction.

Schenck, J., concurs.

Judgment of conviction reversed on the law and new trial ordered.