PEOPLE *v.* VAN CAMP.

1. HOMICIDE—MANSLAUGHTER—EVIDENCE.

Evidence presented in prosecution for first-degree murder *held,* to be sufficient to support jury's verdict that it had been established defendant was guilty of manslaughter beyond a reasonable doubt, since jury had the right to accept the testimony of the pathologist who performed autopsy on victim of the homicide resulting from nocturnal fight in which others than defendant and the victim were involved.

2. SAME—SELF-DEFENSE—EVIDENCE.

Question of self-defense was properly omitted from charge to jury in prosecution for first-degree murder which is claimed to have taken place after 1 a.m. when defendant is shown by undisputed testimony to have been the aggressor or retaliator in fight with victim and record does not indicate defendant ever considered, or had reason to consider, that he was in great peril.

REFERENCES FOR POINTS IN HEADNOTES

[1] 26 Am Jur, Homicide § 17 *et seq.*
[2] 26 Am Jur, Homicide § 548.
[4] 26 Am Jur, Homicide § 488.
[5] 53 Am Jur, Trial § 1105.
[6] 53 Am Jur, Trial § 1113.
[7, 8, 9] 53 Am Jur, Trial § 123 *et seq.*
[10, 13] 31 Am Jur, Jury § 128.
[11, 12] 31 Am Jur, Jury §§ 70, 71.

3. SAME—WEAPONS—MANSLAUGHTER—EVIDENCE—KICKING.
   Submission of question of first-degree murder to jury, notwithstanding there was no weapon, was not error, where there was evidence that defendant kicked the victim to death and jury convicted him of manslaughter.

4. CRIMINAL LAW—ASPERITY OF TRIAL JUDGE—PREJUDICE.
   Such asperity of trial judge as was present in conduct of trial of defendant on charge of first-degree murder *held*, not to have constituted prejudicial error.

5. JURY—IMPEACHMENT OF VERDICT—AFFIDAVITS.
   Jurors may not impeach their verdicts by affidavits, since to do so would open the door for tampering with the jury subsequent to their verdict.

6. SAME—OUTSIDE INFLUENCE—AFFIDAVITS—PREJUDICE.
   Post trial affidavit of juror in trial of defendant, charged with first-degree murder, in support of defendant's claim that he had been prejudiced by outside influence brought to bear upon the jury *held*, too generalized, ambiguous and vague to support such claim of asserted prejudice.

7. TRIAL—REOPENING PROOFS—DISCRETION OF COURT.
   A considerable discretion is vested in the trial judge in relation to granting or denying a motion to reopen proofs after both sides have rested.

8. SAME—REOPENING PROOFS—NEWLY-DISCOVERED MATERIAL EVIDENCE—BURDEN OF PROOF.
   A party seeking to reopen proofs after both sides have rested has the burden of showing that the evidence was both newly-discovered and material.

9. SAME—REOPENING PROOFS—DISCRETION OF COURT—CUMULATIVE IMPEACHING TESTIMONY.
   Trial judge's denial of right to reopen proofs in prosecution for first-degree murder *held*, not to have been an abuse of discretion, where showing made as to testimony sought to be presented was that it was impeaching testimony of a cumulative nature.

10. CRIMINAL LAW—JURY OF 14—EXCUSAL OF JUROR—CONSTRUCTION OF STATUTE.
    The statute authorizing a court of record to impanel a jury of 14 members for protracted criminal cases and empowering the trial court to excuse any of the jurors during the trial for conditions arising during the trial justifying such excusal is

not construed as giving the trial judge arbitrary power to excuse the extra jurors according to his own inclinations (CL 1948, § 768.18).

11. SAME—JURY OF 14—EXCUSAL OF JUROR—JUSTIFICATION.

The factual justification for excusal of a member of a 14-member jury in a protracted criminal case must be similar in character to that which would authorize excusal of a member of a jury panel (CL 1948, § 768.18).

12. SAME—JURY OF 14—EXCUSAL OF JUROR—DISCRETION OF COURT.

Trial judge's excusal of 1 member of 14-member jury after completion of his charge to jury in prosecution for first-degree murder, after he had ascertained she had not properly answered on *voir dire* examination and her conduct during the trial was such as to cause him to have her background investigated, resulting in his discovery her son had been sentenced as an habitual criminal, *held,* not an abuse of discretion (CL 1948, § 768.18).

13. SAME—JURY OF 14—EXCUSAL OF JUROR—STATUTES.

Statute empowering court of record to impanel a 14-member jury in protracted criminal case and authorizing trial judge to excuse a juror for conditions arising during the trial provided number of jurors be not reduced to less than 12 is not unconstitutional as denying defendant a right to a unanimous jury verdict, since the statute is intended to avoid mistrials in cases where a juror is discharged during the course of the trial by reason of personal disability or legal disqualification (Const 1908, art 2, §§ 13, 19; art 5, § 27; CL 1948, § 768.18).

Appeal from Genesee; Gadola (Paul V.), J. Submitted January 15, 1959. (Docket No. 62, Calendar No. 47,741.) Decided July 13, 1959. Rehearing denied October 12, 1959.

Parke Van Camp was convicted of manslaughter. Affirmed.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, and *Jerome F. O'Rourke,* Prosecuting Attorney, for the people.

*Elza H. Papp* (*Richard C. Fruit,* of counsel), for defendant.

EDWARDS, J. As an aftermath of a beer party, participated in by 4 young men (3 of them married) and 2 unmarried young women, defendant got into a fight with 2 of his erstwhile friends. One of them, James Smallwood, died as a result of injuries suffered in the fight. Defendant was charged with first-degree murder, tried and found guilty of the included charge of manslaughter by jury verdict. He received a sentence of 7-1/2 to 15 years.

On appeal defendant presents 7 claims of error.

We will deal first with those which pertain to claimed failure of proof of the *corpus delicti,* to claims of errors in the judge's charge to the jury, and to claims of prejudice on the part of the trial judge. For these, a more detailed version of the events of the evening are required.

Defendant Parke Van Camp was employed at a drugstore in Flint, and on June 21, 1956, worked until after 11 p.m. His wife and baby were out of the city and during the afternoon James Smallwood and Gerald Szabo came by the drugstore and borrowed the key to Van Camp's apartment.

These 2 were joined at the apartment by another mutual friend, Donald Feighner, and 2 young women, Carroll Ann Thompson and Kathleen Ann Porter. At 11:30 Feighner picked up Van Camp at the drugstore and returned with him to the apartment.

The testimony as to what transpired at the apartment is limited to the information that the 6 talked, watched TV and drank beer. It appears that 24 bottles had been purchased. The testimony indicates that the 2 girls split 1 bottle between them, and that each of the young men drank some.

At about 1 a.m. Miss Porter asked to be taken home and all 6 left the apartment in 2 cars, with 1 girl and 2 men in each. In place of proceeding to the girls' homes, they then drove out in the country and eventually arrived at a point on Stanley road

where there was a gate beside the road, leading into a farmer's field. The 4 young men got out of the cars and talked amongst themselves and made some efforts to open the gate.

Suddenly Feighner and Smallwood left the other 2 at the gate, got both girls into Smallwood's car and drove rapidly away. Van Camp chased the car but could not catch it.

Thereupon he and Szabo got into Szabo's car and drove to Miss Porter's home. Shortly after arriving there, they saw Feighner and Smallwood drive up with Miss Porter and Smallwood escort her to the door. Szabo then drove his car up parallel to Smallwood's car.

It is conceded by all that at this point the evening ended in a fight between defendant Van Camp and his 2 erstwhile companions Feighner and Smallwood. It is conceded that in the fight defendant struck the first and last blows and both of his opponents ended up on the ground unconscious. One of them, Smallwood, never came to.

There are 2 basic disputes of facts in the case. The first pertains to what occasioned the fight. Defendant does not offer any explanation for this. One witness for the prosecution, Feighner, asserted that defendant had expressed the intention of raping the girls. This, defendant denies. Another witness, Szabo, asserted defendant opposed taking the girls home and that defendant was angry because the girls were taken home against his wish.

The other dispute of fact involves the actual conduct of the fight. Defendant admits knocking both of his opponents out with his fists. He admits that he struck the first and only blows in the altercation with Feighner. But he claims that the deceased struck him while he was engaged with Feighner, and that he then turned to deceased and knocked him out. He denies kicking either.

The principal witness for the prosecution testified pertaining to the crucial facts of the fight as follows:

"*Q.* What happened when you got in front of Kay's house?

"*A.* Parke jumped out of the car, and he run over to Jim's car, and he hit Don Feighner through the open window.    *    *    *

"*Q.* How far were you from Feighner?

"*A.* Approximately 7 or 8 feet.

"*Q.* Did Van Camp say anything during the time that included from when he got out of your car until the time he hit Feighner?

"*A.* No, sir, he did not.

"*Q.* What happened when he hit Feighner?

"*A.* After he hit Don, he opened the door—car door and he pulled Don by the shirt. He pulled him out of the car, and he hit him again, and Don, he fell to the pavement, and Parke started kicking him.

"*Q.* Where?

"*A.* In the head.

"*Q.* Then what were you doing?

"*A.* At that time I run and I grabbed Parke around the arms, and I told him to leave him alone, and he threw me down to the ground.

"*Q.* Then what happened?

"*A.* And when I come back up to my feet he was swinging at Jim Smallwood.

"*Q.* Where was he at that time?

"*A.* They were at about the curb.

"*Q.* Near whose car?

"*A.* It was near my car.

"*Q.* Were they in the street near the curb or on the grass near the curb?

"*A.* I don't recall.

"*Q.* What did you then see?

"*A.* I seen Jim Smallwood fall after Parke had hit him, and I seen Parke kick him.

"*Q.* Where did he kick him?

"*A.* He kicked him in the head.

"*Q.* How many times?

"*A.* Two or 3 times.

"*Q.* What did you do?

"*A.* I didn't do anything. I just got to my feet, and a lady come out on the porch at that time, and she said she had called the police.

"*Q.* What then happened?

"*A.* That time Parke, he said, 'Let's get out of here,' and he ran, and he picked Don Feighner up, and he put Don Feighner into my car, and I was over trying to talk to Jim, and Jim was unconscious, and he came over, and he picked Jim up, and he threw Jim in his car, and he drove off."

It is undisputed that Smallwood was found dead—later that night, in his own car, at a point to which defendant had driven it.

On autopsy, Smallwood's body was found to have abrasions on the left hand and both elbows, contusions on the left forehead with hemorrhage into the right temporal area, excessive mobility between the 1st and 2d cervical vertebrae and the 7th cervical and 1st thoracic vertebrae, with hemorrhage in the dorsal ligaments and surrounding muscles in the latter region. In addition, both lungs showed extensive hemorrhagic edema ("the lungs, instead of containing air were filled with bloody fluid") which the pathologist identified as the immediate cause of death.

Appellant claims that this record presents insufficient proofs of the *corpus delicti.*

The pathologist who performed the autopsy identified "the injuries around the spinal cord" as the cause of the edema of the lungs. Defendant presented a pathologist who gave contrary testimony on this last point, but the jury had a right to accept the testimony of the pathologist who performed the autopsy. It also had a right to consider the facts of the assault and the circumstances which led to the finding of the dead body in determining whether or

not the crime charged had been established beyond reasonable doubt.

In *People* v. *Gerndt,* 244 Mich 622, this Court said, in dealing with a case where, contrary to this one, the evidence was partly circumstantial (p 632):

"The mere possibility that the deceased may have come to her death otherwise than in the manner charged in the information, especially since such suggested possibility is not supported by any proof in the case, is not sufficient to justify setting aside the verdict of the jury, notwithstanding the same was based in part on circumstantial evidence."

Appellant claims that the circuit judge should have submitted to the jury the question of whether or not defendant acted in self-defense.

Whatever defendant Van Camp's basic intentions may have been, we think the undisputed testimony requires the inference that he became angered by the actions of Feighner and Smallwood in taking the 2 girls home and that the testimony indicates that defendant was the aggressor all the way through the subsequent altercation. We note defendant's claim that he was struck from behind by Smallwood while he was engaged in knocking Feighner out. But, leaving aside the question of justification for Smallwood's action, defendant himself describes his subsequent attack on Smallwood not as self-defense but as retaliation.

We do not think that the circuit judge erred in withdrawing this question of self-defense in his charge. There is nothing in this record to indicate that defendant ever considered, or had reason to consider, that he was in great peril. See *People* v. *Doe,* 1 Mich 451; *People* v. *Giacalone,* 242 Mich 16.

Nor do we think the charge was in error in submitting to the jury the question of first-degree murder. We note the absence of any weapon. But we

entertain no doubt that kicking a man to death can constitute first-degree murder if the clear intent to kill is present. *People* v. *Collins,* 303 Mich 34.

See, also, 22 ALR2d 854, annotation: Inference of malice or intent to kill where killing is by blow without weapon.

In fact, after careful review, we are inclined to characterize the judge's charge in appellant's counsel's own terms, "a very good charge."

We have also reviewed appellant's complaints pertaining to the trial judge's conduct of the trial. Though some rulings seem to have been delivered with more asperity than appears necessary from the printed record, we do not find prejudicial error in any such instances.

Appellant also presents 3 other aspects of the trial in his appeal.

He presents an affidavit from a female juror asserting that the male members of the jury pressured and intimidated her into joining in a guilty verdict. The record makes plain that she did join in the verdict of guilty when the jury was polled. In *People* v. *Pizzino,* 313 Mich 97, 105, this Court said:

"The rule is well established that jurors may not impeach their verdicts by affidavits. To permit this would open the door for tampering with the jury subsequent to the return of their verdict."

See, also, *In re Merriman's Appeal,* 108 Mich 454.

Appellant, however, seeks to rely upon the exception to the rule pertaining to jurors' affidavits stated in *Mattox* v. *United States,* 146 US 140 (13 S Ct 50, 36 L ed 917), by arguing that this affidavit showed defendant had been prejudiced by outside influence brought to bear upon the jury. We have inspected the affidavit with care in this regard. The sentence in the affidavit relied upon is generalized, ambiguous and vague. There is no showing that

any juror was influenced. In short, the affidavit does not by any means meet the *Mattox* test.

Much the same can be said about the appellant's counsel's motion to reopen proofs after the close of testimony, and the affidavit ultimately filed in support of the motion for new trial. After several days' trial, both sides rested, on a Friday. On Monday, prior to jury argument and charge, appellant's counsel moved to reopen proofs, asserting that over the week end a potential witness had come into his office to relate a conversation with prosecution witness Szabo, at the Smallwood funeral, which differed from the account of Szabo's testimony at the trial as carried in the Flint Journal account.

The judge was not furnished with the newspaper account, or with any affidavit of the proposed witness relating the testimony he was prepared to offer. Indeed, when such an affidavit was presented some 6 months later on motion for new trial, its terms were no more definite or revealing than the oral presentation of defendant's counsel at the motion for reopening.

A considerable discretion is vested in the trial judge in relation to granting or denying a motion to reopen after both sides have rested. *People* v. *Chimovitz,* 237 Mich 247; *People* v. *Baker,* 332 Mich 320.

It is impossible for us to say, even after an inspection of the somewhat belated affidavit, that the proposed testimony was material, or that its exclusion was prejudicial to defendant's cause. As in the instance of a motion for new trial, the burden of showing that the evidence was both newly-discovered and material was on the appellant. At best, the showing offered here was that of impeaching testimony of a cumulative nature. We believe it might have been better practice to have allowed the proposed witness to be produced before the

judge for ascertainment of the nature of his testimony before ruling on the motion to reopen. But we cannot say, under the circumstances recited, that the trial judge's denial was an abuse of discretion. *Cf. People* v. *Serra,* 301 Mich 124; *People* v. *Paugh,* 324 Mich 108.

Finally, appellant contends that the trial judge improperly excused a juror, and hence violated his constitutional right to a jury trial.

At the commencement of this murder trial a jury consisting of 14 members had been duly impaneled. Selection of 14 jurors, rather than 12 jurors, was made pursuant to statutory authority granted to a trial judge in a criminal matter where the trial is likely to be protracted. The statute (CL 1948, § 768.18 [Stat Ann 1954 Rev § 28.1041]) provides:

"Any judge of a court of record in this State about to try a criminal case which is likely to be protracted, may order a jury empaneled of not to exceed 14 members, who shall have the same qualifications and shall be empaneled in the same manner as is, or may be, provided by law for empaneling juries in such courts. All of said jurors shall sit and hear said cause. *Should any condition arise during the trial of said cause which in the opinion of the trial court justifies the excusal of any of the jurors so empaneled from further service, he may do so and said trial shall proceed, unless the number of said jurors be reduced to less than 12,* and in the event that there shall be more than 12 jurors left on said jury after the charge of the court, the clerk of the court in the presence of said court shall place the names of all of the said jurors on slips, folded so as to conceal the names thereon, in a suitable box provided for that purpose, and shall draw therefrom the names of a sufficient number to reduce the jury to 12 members who shall then proceed to determine the issue presented in the manner provided by law." (Italics supplied.)

After the trial judge completed his charge to the jury, he announced that juror Rhea Goodman was excused from further participation in the case. A second juror was excused, by lot, thereby reducing the number of jurors to 12. Thereafter the case was submitted to the 12 remaining jurors who, after due deliberation, returned a verdict against the defendant.

No issue is presented as to the juror excused by lot under the statute recited, nor is any objection made to the competence of the 12 remaining jurors.

Appellant's argument is that the dismissal of juror Goodman was purely arbitrary on the part of the trial judge and, if empowered by statute, that the statute is unconstitutional in denying defendant *in reality* a trial by jury under article 2, §§ 13 and 19, and article 5, § 27, of the Michigan Constitution (1908).

The trial judge relied upon the authority of the statutory provision quoted and italicized above.

He gave his reasons as follows:

"Now, the reason for it was very simple. In the first place that juror did not properly answer on the *voir dire* examination, or she probably would have been excused then. In addition to that the court had the opportunity to watch her, to observe her, the shaking of her head, her conduct, her talking, the way she did all the way through, and then because of her attitude, the court investigated her background, and the court found that her son is a habitual criminal, has been sentenced by this court, and the court felt it would be best to excuse her, and he took that prerogative under the statute and did excuse her, and there were 12 jurors left in the box acceptable to the parties involved, so there was no harm done to anyone."

We certainly do not construe the statutory provision as giving a trial judge arbitrary power to

excuse the extra jurors according to his own inclinations.

There must be factual justification under the statute similar in character to that which would authorize excusal of a member of a jury panel.

Dealing with a similar provision in a New Jersey statute, the New Jersey court of errors and appeals, said:

"It has been suggested that too broad a power is vested by our act in the trial judge in that it permits the judge to order the empanelling of 14 members where the trial is likely to be protracted, and in further authorizing him in his discretion to excuse a juror should a condition arise during the trial justifying such course. This we think presents no constitutional question and we are not impressed by the fear that the power will be abused. In someone must be reposed the right to determine when the 14 members shall be called and to determine when during the trial a juror should be excused. Like power already exists in the right to excuse, to declare a mistrial, and in the selection of struck juries. Certainly in no safer place could the authority thus given be reposed than in the judge of the court. The dangers suggested in the power to excuse jurors we think do not exist, and if upon occasion the authority thus given should be exercised improperly there is ample power of review to correct the wrong that may be done." *State* v. *Dolbow,* 117 NJL 560, 568 (189 A 915, 919, 109 ALR 1488).

We cannot say, in the face of the reasons he recited, that the trial judge's action was arbitrary or an abuse of the discretion spelled out by the statute previously cited.

Nor do we think the statute, as we construe it, is unconstitutional on the grounds that it destroys defendant's right to a unanimous jury verdict.

The statute is intended to avoid mistrials in cases where 1 or more of the original jurors is necessarily

discharged during the course of the trial by reason of personal disability or legal disqualification. Most States, as well as the Federal jurisdiction, do have statutes providing for alternate jurors in criminal cases. In those States where constitutional attacks have been made, the provisions for alternate jurors have been upheld. *State* v. *Dolbow, supra; State* v. *McIntire,* 221 SC 504 (71 SE2d 410) ; *Robinson* v. *United States* (CCA 6, 1944), 144 F2d 392; *State* v. *Dalton,* 206 NC 507 (174 SE 422).

In *Robinson,* the court said (p 397):

"We find no merit in appellant's contention, first, because it appears that he was tried by an impartial jury of 12. Miller [the 13th juror] was a competent juror, was unchallenged upon any ground of personal disqualification, sat next to the jury box until he was substituted as a regular juror, and then took his place as such. He saw and heard all the proceedings of the trial and was segregated with the other jurors, and there is nothing to indicate that his participation in the deliberations of the jury was prejudicial. He obeyed the orders and admonitions of the court, just as did the other jurors. This is the first attack upon the constitutionality of the act in question and we find no reason to think that it is unconstitutional. It is a forward looking statute and a needed reform in procedure."

See, also, 70 ALR 188, annotation: Constitutionality and construction of statute providing for substitution or replacement of individual juror during trial. Supplemented in 96 ALR 793 and 109 ALR 1495.

Affirmed.

Dethmers, C. J., and Carr, Kelly, Smith, Black, Voelker, and Kavanagh, JJ., concurred.