**UNITED STATES of America**

v.

**William Paul KOHNE et al.**

**Crim. A. No. 71–254.**

United States District Court,
W. D. Pennsylvania.
April 23, 1973.

See also, D.C., 358 F.Supp. 1053.

---

Samuel J. Orr, III, Asst. U. S. Atty., Pittsburgh, Pa., for the U. S.

James A. Ashton, Pittsburgh, Pa., for defendants William Paul Kohne, Patrick Denham and Jeanine Denham.

Martin M. Sheinman, Pittsburgh, Pa., for defendants Patsy Stanizzo and Betty Howden Stanizzo.

Ray Radakovich, Pittsburgh, Pa., for defendant Joseph Tabella.

James R. Fitzgerald, Pittsburgh, Pa., for defendant Paul Patrick Woods.

Gilbert M. Gerber, Pittsburgh, Pa., for defendant Frank DeLucia.

## OPINION AND ORDER

MARSH, Chief Judge.

After a protracted criminal trial of five and one-half weeks, the jury in the above case returned verdicts which found the defendants, William Paul Kohne, Paul Patrick Woods, Patsy Stanizzo, Betty Howden Stanizzo, Joseph Tabella, Patrick Denham, Jeanine Denham and Frank DeLucia, not guilty of Count 1, conspiracy, and guilty of Count 2, violating the federal gambling statute, Title 18 U.S.C. § 1955.

The jury retired to deliberate at 1:10 p. m. on Tuesday, February 13, 1973, and returned the verdicts on Wednesday, February 14th, at approximately 4:30 p. m., after spending the night at the William Penn Hotel in Pittsburgh.

On Monday, February 19, 1973, Steve Tisak, No. 10 juror, went to the law office of James A. Ashton, Esq., where he met with three defense counsel, including Attorney Ashton, who represented William Paul Kohne, the owner of the alleged illegal gambling business, and defendants, Patrick and Jeanine Denham. There he signed a written question and answer statement in which he repented joining in the verdicts of guilty and complained about the words and actions of some other jurors, the hotel "cots", and worry over an erratic oil heater in his home.

On February 20, 1973, the defendants, William Paul Kohne, Patrick Denham and Jeanine Denham, filed a motion for mistrial alleging that Mr. Tisak rendered guilty verdicts because he "was coerced by threats of physical harm that he felt were real." Mr. Tisak's unsworn statement was attached. In their motion for mistrial, the moving defendants requested "that an evidentiary hearing be held by this Court to determine all facts which are germane to the issues raised by this petition, subject to the right of examination and cross-examination by all affected parties."

All defendants have filed motions for a new trial. All defendants, except Patsy Stanizzo and Betty Howden Stanizzo, alleged as one of the reasons for a new trial that juror No. 10 was coerced into finding the defendants guilty of Count 2. Defendants, Patsy Stanizzo and Betty Howden Stanizzo, alleged in their motion that the verdicts of the jury might have been the result of a compromise or

of some type of coercion brought on by the inadequate accommodations the jurors had during their overnight sequestration. Defendant Tabella alleged that since "the jurors were made to sleep ten in one room overnight", such an atmosphere was not conducive to a fair and impartial trial.

The William Penn Hotel is one of Pittsburgh's leading hotels where, to my knowledge, many juries have been sequestered overnight during the past 20 years. Five juries have spent the night in that hotel so far this year. I have not heard of any prior complaints about the accommodations. Even if the "cots" were not entirely to Tisak's liking, I find that the accommodations were adequate. (See: Exhibits 2, 3.)

Obviously, there is nothing in Tisak's written statement which would warrant ·impeachment of the verdicts. He does not assert that he was "coerced" into rendering the guilty verdicts. His predominant concerns were the performance of the oil heater at his home and the prospect of spending another night on a "cot" in a room with eight other exasperated male jurors. But because there was innuendo of threats of bodily harm, with considerable reluctance, I granted the request for a hearing to determine if there were genuine attempt to inflict bodily harm upon Tisak, or threats which actually put him in fear of bodily harm. Cf. United States v. Grieco, 261 F.2d 414, 415 (2d Cir. 1958).

All counsel were notified; four defense attorneys attended the hearing as well as the Assistant United States Attorney, who prosecuted the case.[1] Several defendants were present. Juror, Steve Tisak, was present and was examined by me at some length. Counsel for the government and counsel for the defendants who were present were not permitted to cross-examine Tisak. United

States v. Grieco, supra, pp. 414–415. However, all counsel who were present were given the opportunity to suggest additional questions that they desired me to put to Tisak. No specific question was suggested.

Three of the jury attendants, a Marshal, Mr. Ray Eschman, my law clerk, Mr. James West, and the court-crier in attendance, Mr. William Ellis,[2] were also questioned by me. Counsel for the defendants were given the opportunity to examine these witnesses. Counsel for the defendants questioned Mr. Ellis; no questions were asked of either Mr. West or Mr. Eschman.

From the testimony taken, I find the following facts:

Steve Tisak was seated as juror No. 10 and served the entire duration of the trial. Tisak wrote and sent three communications to me; one during the course of the trial and two on February 14th, while the jury was deliberating. Tisak is not a frail man; he is 5′ 8″ in height, weighs 150 pounds, and is a truck driver and construction worker. From his appearance and demeanor, he did not appear to be a "weak sister" or a "shrinking violet" who would easily be intimidated by threats. On the contrary, he seemed to be endowed with the characteristics of an individualist and a worthy opponent for his 11 peers in the advocacy of his positions. His will was not overborne by threats of violence; to the contrary, his mind was changed in the heat of deliberations and shortly after my response to his last written question.[3] I gathered from his testimony that he was greatly concerned about being sequestered because of a problem that he was having with an oil heater in his home. He testified that he was not allowed to make a call to have someone check his heater. Pursuant to Tisak's written instructions (Exhibit 1), Mr. West made a call to Andrew Yanchik at

---

1. Attorney Ashton did not attend due to the death of his father.

2. Mr. West and Mr. Ellis and the Marshal were sworn to safeguard the jury.

3. The jury returned unanimous verdicts within 11 minutes after my response to Tisak's last question.

8:30 p. m. on February 13th to inform him that Tisak would be detained overnight. Tisak testified that he had previously arranged with Mr. Yanchik to feed his dogs if he was detained overnight. Tisak recalled writing the message and giving it to Mr. West, but erroneously thought it took place at 5:30 in the afternoon. Late that evening at the hotel, Tisak requested Mr. Ellis to make another call concerning his car which he had parked in Aliquippa that morning, but this request was refused because Ellis felt he could not leave the jurors unattended to make the call, and Tisak did not seem to be overly concerned. *No mention was made of the oil heater to either West or Ellis.*

Tisak also testified that at the conclusion of the charge, he remembered that I inquired whether any juror was unable to stay overnight if such became necessary. In response to that inquiry, Mrs. Csurilla, a juror, stated she could not stay overnight because she had two children at home with no one to care for them, and she was excused, but Mr. Tisak did not mention that the oil heater constituted a danger to his home.

In his statement Tisak described the threats as follows:

" * * * Other jurors said they did not intend to sleep on them cots again.. One [juror] stated if he has to sleep there again he will be in Federal Court in the morning for murder. Through the day two jurors acted in such a manner that I thought they would pick up a chair and break it on my head because I would not vote blank [sic] guilty charges. Now, I finally voted guilty on a [sic] gambling charges because it was admitted in Court that gambling was performed. * * * I signed guilty on that blank [sic] charges because I myself did not want to sleep at the hotel with those people because I did not think I would have walked out of that place the next day after sleeping on those cots. * * * [O]ne juror stated Wednesday, 'I do not get mad, I just get even.' "

Tisak testified that the alleged threats occurred on Wednesday, February 14th, in the jury room, but Mr. Ellis and the Marshal in attendance stated that Tisak did not inform them at any time about any threats that were being made against him.

At the hearing Tisak testified that one juror acted very nervous and grabbed the back of his chair, and one juror stood up flexing his muscles. But he also testified that no one picked up a chair and attempted to strike him over the head with it. He admitted that no one so much as touched him or attempted to touch him. In connection with Tisak's written statements concerning a juror being in federal court for murder if he had to stay another night, and a juror stating, "I do not get mad, I just get even", he admitted that these assertions were not accompanied by any act or threats of physical violence directed at his person.

Tisak also testified that several jurors were hollering at him and called him, among other things, "an opinionated ass". He related that several of the jurors told him that if they had to stay another night, they would go bankrupt.

From the testimony of Tisak, it seems obvious that on Wednesday all the jurors favored acquittal of the defendants of Count 1, and 11 jurors favored conviction of the defendants of Count 2. Tisak was the holdout. He testified that he had problems with the effect of the terms "wilfully and knowingly". This problem was a subject of the two communications he sent to the court on Wednesday, February 14th, prior to the return of the verdicts by the jury. Tisak knew that he could communicate with the court by writing a message and handing it to the bailiff. This he had done once during the trial and twice during the deliberations. His assertion that he did not know how to communicate the alleged threats is not convincing.

He stated during the hearing that with the problem of his heater troubling him, he thought he might as well give

in, sign the verdict slips and go home. In response to my question: "Why didn't you write a note to me and tell me that jurors were threatening you and give it to the bailiff?", Tisak replied: "Sir, about that time all I wanted to do was get out of here and see if my place burnt [sic] down or if I was out _ _ _ . All I wanted to do is get out of the place and forget everything."[4]

It was only after he reconsidered over the weekend that he decided to impeach his verdicts and returned on February 19th to the Courthouse, which was closed because it was a holiday, and eventually made his way to Attorney Ashton's office.

When the jury announced it had arrived at verdicts, and after the verdicts had been announced in open court, the clerk polled the jury and Tisak replied affirmatively that the verdicts as read were his verdicts. He did not complain of threats or fear then in open court or to any other person until five days later.

■■ Assuming that the testimony of Tisak is credible, I conclude that the statements and actions of some of the jurors amounted only to heated expressions of annoyance with Tisak during the second day of deliberations; that the threats were empty ones, expressive of impatience, exasperation and frustration, and did not actually cause Tisak to fear bodily harm, or forcibly compel him to change his vote. The expressions used by some jurors, combined with Tisak's urgent desire to go home because of the erratic heater and the hotel "cot", are not sufficient grounds to impeach the verdicts. Whether or not those expressions and his concern about the heater and the "cot" were effective to induce Tisak to join in the verdicts are not subjects for investigation. Jurors are allowed to testify only as to the nature of outside influences, but not as to the subjective effect of the intrusions upon their mental processes. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50,

36 L.Ed. 917 (1892); Jones, Evidence, Vol. 3, § 20:58, p. 732 (6th ed.).

Based on the evidence, it is my opinion that the motion for mistrial and the motions for a new trial on the grounds of coercion and inadequate hotel accommodations should be denied.

■ It is generally held that jurors may not impeach their verdict by testimony that it resulted from coercion or majority vote. See: 8 Moore's Federal Practice ¶ 31.08, pp. 31–55, 31–56; 6A Moore's Federal Practice ¶ 59.08 [4], p. 3796; Jones, Evidence, Vol. 3, § 20:58, p. 727 (6th ed.); 8 Wigmore, Evidence, §§ 2345–2356 (1961); Wright, Federal Practice and Procedure § 554, pp. 493–494.

The Proposed Rules of Evidence for United States District Courts and Magistrates, Rule 606(b), provides as follows:

"(b) *Inquiry into validity of verdict or indictment.* Upon an inquiry into the validity of a verdict or indictment, *a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations* or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received." (Emphasis supplied.)

The Advisory Committee's Note states, *inter alia*, that to allow inquiry into the mental operations and emotional reactions of jurors would place every

---

4. None of the parties ordered the transcript of the hearing. This quotation was read to me by the Official Court Reporter from her notes.

verdict at the mercy of jurors and invite tampering and harassment; substantial authority refuses to allow a juror to disclose *irregularities which occur in the jury room.*

The American Bar Association Project on Minimum Standards for Criminal Justice, Approved Draft, Trial by Jury, § 5.7, provides:

"5.7 Impeachment of the verdict.

"(a) Upon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror or concerning the mental processes by which the verdict was determined."

The commentary to the section states that about two thirds of the states take the strict view that a juror is incompetent to testify concerning his verdict under any circumstances.

An example set forth in the commentary observes that a juror would not be permitted to testify that he was induced to agree to a verdict because his wife was ill and he was anxious to get home. Thus it would seem that if Tisak agreed to verdicts because he was concerned about his erratic oil heater, or his dogs and cat, or the conduct or statements of other jurors, and was anxious to get home, such would be insufficient to impeach the verdicts.

Many states follow the rule formulated by Lord Mansfield, Vaise v. Delaval, 1 Term R. 11 (K.B.1785), to the effect that the testimony of a juror cannot be used to impeach a verdict, even though the jury's conduct otherwise proved would require a new trial. However, it seems established that the more liberal federal view permits testimony of a juror pertaining to outside influences. Mattox v. United States, *supra*; United States v. Kum Seng Seo, 300 F.2d 623 (3d Cir. 1962); Richardson v. United States, 360 F.2d 366 (5th Cir. 1966); 2 Wright, Federal Practice and Procedure, Criminal § 554, pp. 488–492. See also, State v. Kociolek, 20 N.J. 92, 118 A.2d

812 (1955) (Brennan, J.). In the case *sub judice* there were no elements of jury misconduct such as extraneous influence upon the jury within or outside the jury room: i.e., no evidence of prejudicial newspapers being introduced into the jury room, or unauthorized statements of bailiffs made to the jury or a juror, or a witness conversing with a juror.

Hyde v. United States, 225 U.S. 347, 382–384, 32 S.Ct. 793, 808, 56 L.Ed. 1114 (1912), presented a situation, on a motion for a new trial, where it was contended that the conviction of two of the defendants and the acquittal of two of the defendants was the result of an illegal agreement among the jurors fostered by what amounted to coercion by the Court. It was held:

" * * * [T]hat the testimony of jurors should not be received to show matters which essentially inhere in the verdict itself and necessarily depend upon the testimony of the jurors, and can receive no corroboration."

In McDonald v. Pless, 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915), on motion for a new trial, a juror was not permitted to testify on the ground that a juror was incompetent to impeach his own verdict. The Court cited Hyde v. United States, *supra,* and stated:

"For while by statute in a few jurisdictions, and by decisions in others, the affidavit of a juror may be received to prove the misconduct of himself and his fellows, the weight of authority is that a juror cannot impeach his own verdict. The rule is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to tes-

tify as to what had happened in the jury room."

In Johnson v. Hunter, 144 F.2d 565 (10th Cir. 1944), the Court affirmed the denial of a state prisoner's petition for habeas corpus. The Court observed that petitioner's allegation that one negro juror was intimidated by 11 white jurors would, if true, invalidate the verdict. Without holding a hearing, the Court observed the fact of intimidation probably could not be proved since the necessary witness would be the negro juror who could not testify because of the general rule that evidence of jurors is not admissible to impeach their verdict.

In United States v. Grieco, *supra*, a female juror wrote to the trial judge stating that she wanted to vote for acquittal but a male juror was "very abusive", so much so that she was "shaken and crying" when she finally agreed to concur with the rest, and that she now wished "to retract". A hearing was held; the judge examined the juror; refused to permit the defendant's attorney to examine the juror; and denied the motion for a new trial. The Court of Appeals affirmed, stating:

"We do not say that there can be no threats short of violence by one juror against a recalcitrant dissenter that will upset a verdict, but certainly there was nothing in the case at bar to justify such action. So far as appears, it was only the blustering arrogance of her fellow that so agitated the juror that, after she had later had time to reflect, she concluded that she had not voluntarily concurred in the verdict."

In People v. Van Camp, 356 Mich. 593, 97 N.W.2d 726, 730–731 (1959), the male jurors pressured and intimidated a female juror into joining in a guilty verdict. It was held that such evidence did not meet the test in Mattox v. United States, *supra*.

In Parsons v. United States, 188 F.2d 878, 879 (5th Cir. 1951), the defendant was convicted of receiving a stolen automobile. The Court said:

"Another [ground for a new trial] is the claimed misconduct of the jury, as attempted to be shown by the impeaching affidavit of one of the jurors as to matters said and done in the jury room.

"It is too well settled for argument or discussion that in the federal system jurors will not be heard to impeach their verdict by affidavits or testimony as to the manner of arriving at it."

In People v. Zelver, 135 Cal.App.2d 226, 287 P.2d 183 (1955), sentence was imposed on two counts of felony. The Court of Appeals affirmed the conviction, stating at pages 188–189:

"On motion for a new trial, the defendant presented the affidavit of the juror, Myrtle Strong, to the effect that she had been 'coerced' and 'intimidated' into voting for a verdict by insulting and abusive language used to her by other members of the jury. The trial court rejected the affidavit, and properly so. The rule that a juror cannot impeach his own verdict except in the single case of a verdict arrived at by chance or lot is too well intrenched to be now challenged. [Citations omitted.]"

In Commonwealth v. Patrick, 416 Pa. 437, 206 A.2d 295, 297 (1965), it was held that the verdict of the jury cannot be impeached by the affidavit of one juror alleging coercion by the other jurors. The Court stated:

"Our Courts have repeatedly held for over 150 years that after a verdict is recorded, and after the jury has separated and been discharged, jurors may not invalidate or impeach a verdict by their own testimony."

*Cf.* Brinsfield v. Howeth, 110 Md. 520, 73 A. 289 (1909).

The state of the law on the problem of posttrial communications with jurors is uncertain and conflicting.[5] Inasmuch as

5. April, 1972 Report of the Committee on Operation of the Jury System to the Judicial Conference of the United States, Appendix B, p. 38. See: "City of Miami

there was no independent evidence of juror misconduct, and no evidence of outside influences, and since I find that juror Tisak was not compelled to join in the verdicts of guilty by violence or intimidation, his written statement and testimony, even if true, are insufficient to impeach the verdicts. Moreover, from his testimony, the cause or causes responsible for his joining the majority is a matter of sheer speculation. It might have been because he feared his house might burn down; he might have been influenced by my answer to his final question, or by the arguments of his fellow jurors, or by their heated expressions and impatient conduct in the jury room; he might have been influenced by the prospect of spending another night on a "cot" in the hotel; he might have joined in the verdicts out of weariness, a sense of frustration or futility, or an overriding desire to get home. His capitulation might have resulted from a combination of the foregoing and other undisclosed motivating factors, but under the law his subjective reasons for joining in the verdicts are inadmissible.

An appropriate order will be entered.

See also D.C., 358 F.Supp. 1046.

v. Bopp, 117 Fla. 532, 158 So. 89 (1934) Miami Supreme Court—Opinion by Justice Buford" and "People v. McNaspie, 261 App.Div. 657, 27 N.Y.S.2d 906 (1941)

New York Supreme Court, Appellant [sic] Division, Opinion by Presiding Justice Hill" cited by defendant Kohne.