OPINION OF THE COURT
William Kapelman, J.
This motion was brought by the defendant based on CPL 440.10 (subd 1, par [f]) seeking a vacatur of the verdict of April 12,1980 and a new trial. The basis for this motion is the conduct that allegedly occurred during the jury’s deliberations. Procedurally, the defendant also moves for a change of venue to New York County.
The request for change, of venue must be the first issue this court addresses. The defendant does not claim that this court would not be fair, nor does he claim that the court would possibly be a material witness. (Compare People v Rodriquez, 14 AD2d 917, 918.) Moreover, it would also appear that the Judge who presided over the trial, as well as the deliberations, should logically be the one to hear any issue that relates to those proceedings. Finally, it must be noted that the defendant requested at oral argu *205 ment that this part of his motion be waived, should this court rule in his favor on his substantive claims. This failure to rely on this contention unless his motion fails on its merits points up the intrinsic weakness of the motion for change of venue. The motion is denied.
The defendant’s motion also addresses alleged conduct during the jury’s deliberations that, he claims, denied him a fair trial. Affidavits of jurors dated May, 1980 and November, 1980 were submitted to the court on December 22, 1980. Opposing affidavits of representatives of the office of the District Attorney who interviewed those jurors contradicted various facts asserted in the earlier ones. An affidavit of an investigator who interviewed a court officer was then submitted by the defendant, and the District Attorney later submitted an affidavit from that officer dated February 19, 1981. On March 12, 1981, defendant submitted his reply memorandum of law. Oral argument was had before this court on March 18, 1981.
Specifically, the defendant raises the following plaints: (1) intimidation of jurors through the alleged use of obscenities, epithets and the slamming of fists; (2) the alleged refusal of the foreman to report to the court that the jury was deadlocked; (3) the alleged throwing of a chair by one juror; (4) the alleged inaction of a court officer when he heard a loud noise and interrupted deliberations in the belief that someone may have required medical attention; and (5) the alleged use of notes by one of the jurors. This court, after a review of the pertinent case law, shall address these contentions collectively as well as ad serriatim.
The rule that statements by jurors may not be used to impeach a verdict once the jury has been discharged reflects the reluctance of courts to inquire into the process of deliberation. (Stein v New York, 346 US 156, 178; McDonald v Pless, 238 US 264, 267-269; Mattox v United States, 146 US 140, 148.) This rule also serves to enforce several public policies. Thus, it is designed to discourage the harassment of jurors by losing parties. The rule thereby reduces incentives for jury tampering. It also fosters open discussion among jurors in their deliberations. It clearly promotes a verdict’s finality and maintains the viability of the jury as a judicial decision-making body. (Stein v New *206 York, supra, at p 178; McDonald v Pless, supra, at pp 267-268; Mattox v United States, supra, at pp 147-151; 8 Wigmore, Evidence [McNaughton rev, 1961], §§2349, 2352-2354.)
The rule, however, is subject to an exception where there has been an improper, outside influence on jury deliberations. The exception does not encompass the ways the individual juror was influenced or the effect on mental processes. (Stein v New York, supra, at p 178; Mattox v United States, supra, at pp 148-149; see Federal Rules of Evidence, rule 606, subd [b]; American Bar Association Project on Standards for Criminal Justice [1974], Trial by Jury, § 5.7.) Evidence of discussions among jurors, intimidation or harassment of one juror by another is, therefore, within the rule. (United States v Eagle, 539 F2d 1166, 1170, cert den 429 US 1110; Government of Virgin Is. v Gereau, 523 F2d 140, 151, cert den 424 US 917.)
Thus, a juror’s statements that he was influenced by improper remarks of fellow jurors and that he assented to the guilty verdict but did not believe in the defendant’s guilt were held insufficient to impeach the verdict where the juror was polled and affirmed his opinion in open court. (Klimes v United States, 263 F2d 273.) Juror pressure is “indigenous to the jury system.” (United States v Stoppelman, 406 F2d 127, 133; accord United States v Grieco, 261 F2d 414; United States v Kohne, 358 F Supp 1046, affd 487 F2d 1395.)
Outside influences which have served to impeach verdicts include prejudicial publicity injected into the deliberations (Remmer v United States, 347 US 227, 229; United States v McKinney, 429 F2d 1019, 1025,1030, cert den 401 US 922), or comments by court personnel on the merits of the case. (Parker v Gladden, 385 US 363, 364-365.)
The New York Court of Appeals has similarly narrowly construed this exception to the rule prohibiting impeachment of a jury verdict. The court recognized that “scarcely any verdict might remain unassailable, if such statements were admissible”. (People v De Lucia, 20 NY2d 275, 278.) The court observed (p 278) that “articulate jurors may intimidate the inarticulate, the aggressive may unduly *207 influence the docile”. Nonetheless, the court allowed that an illegal viewing of the crime scene coupled with a reenactment of the alleged crime warranted a new trial without proof of how the unauthorized visit may have influenced the individual jurors. (Supra, p 280.)
In People v Ciaccio (47 NY2d 431), a new trial was ordered because the court clerk had entered the jury room during stalemated deliberations and falsely told the jurors that the Judge had stated that a lot of time and money were invested in the case and that they should keep deliberating. To the same effect is People v Rivera (26 NY2d 304, 307), wherein the jurors may have seen that the defendant was charged with similar crimes not admissible in the case for which he was on trial. (See, also, People v Rosario, NYLJ, May 15, 1981, p 14, col 2.)
This exception was also construed to include performing an experiment on one’s own and reporting the results back to the jury. (People v Brown, 48 NY2d 388.)* In each of the above cases, the limited exception either facially warranted a new trial, or prejudice was demonstrated by objective facts as they impacted upon the particular trial. This court is obliged, therefore, to follow a similar analysis. It is also mindful that, upon a motion to vacate a judgment, the defendant must bear the burden of establishing his contention by clear and convincing evidence. (People v Weiss, 19 AD2d 900.)
The allegations raised by the affidavits involve neither third-party information improperly introduced into the deliberations, nor any objectively demonstrated defect that does not depend on the mental processes of jurors. Each and every complaint, therefore, falls within the prohibition of the general rule. For all the reasons and policies that the rule was created to safeguard, this court adheres to that rule.
*208 But other reasons compel this conclusion. The policy underlying the finality of a verdict is reinforced by the practice of polling the jury after the foreman states the verdict. When the verdict as to Jacobson was returned, the jury was formally polled, and everyone declared his or her assent. This procedure provided each juror the opportunity to speak up and/or dissent. (See United States v Schroeder, 433 F2d 846, 851, cert den 401 US 943.) The time for postverdict doubts had passed. (CPL 310.80.) The tardiness of the affidavits and the way in which at least one was procured — evidently initially through the defendant’s paramour who fled with him on his escape from prison — emphasize the logic underlying the finality of a polled jury.
The chronology of the events also militates against the defendant’s contention that some jurors changed their votes out of fear. Over the course of five days of deliberations, the jury returned with requests for readbacks, requests for instructions, requests for exhibits and an acquittal of defendant Jacobson’s codefendant. The jury was obviously interacting. It returned with one “deadlock” note as to the defendant’s guilt or innocence. With respect to the time frame immediately preceding the verdict against the defendant, however, the record is telling:
11:27 a.m. Readback of testimony of Leslie Hammond in response to jury’s note.
11:35 a.m. Completion of readback. Deliberations resumed.
Lunch break.
2:55 p.m. Jury note requesting readback of a portion of Melanie Cain’s testimony.
4:10 p.m. Completion of readbacks. Deliberations resumed.
4:15 p.m. Jury note received indicating a verdict had been reached.
4:35 p.m. Verdict was recorded. Jurors were polled.
This sequence establishes beyond cavil that the jurors were exercising their prerogative to hear testimony and were engaging in what must have been a vigorous and perhaps vituperative give-and-take. The jurors heard testimony *209 twice that day. It proved to be pivotal, and they returned five minutes later with the verdict. This order of events demonstrates that the jury displayed independence of thought. Perhaps more importantly, it illustrates the fact that the complaining jurors had several opportunities to communicate directly with the court if they felt unfairly coerced, harassed or intimated, or if a chair had been thrown at anyone of them or if they felt in physical danger. This was not done. Contrariwise, they returned with, and affirmed, the guilty verdict. Lastly, this chronology rules out most vividly the notion that the verdict came on the heels of the chair-throwing incident. Both the defendant and the District Attorney agree that there was a one- to two-hour interval between the incident and the verdict. Not only did at least one and one-half hours intervene from 2:55 to 4:30 p.m. (with the possibility that the episode occurred between lunch and 2:55 p.m.), but the jury sent a note requesting testimony and had the opportunity to transmit any grievances to the court. This failure to so communicate points up the reason for the prohibition against impeachment of jury verdicts. Later misgivings, with the potential for jury tampering or mere afterthought, cannot be a sound basis for undoing a verdict. For all these reasons, the court believes that the contentions of defendant have not been proven.
Assuming, however, that the issues were viewed not as the admissibility of the jurors’ affidavits, but rather as their sufficiency to vacate the verdict or their demonstration of undue prejudice to the defendant (see Klimes v United States, 263 F2d 273, 274, supra) this court must arrive at the same conclusion as to each event raised by the defendant as well as their alleged effect in tandem. To wit: Case law recognizes that the application of pressures, including obscenities and fist slamming, are a real part of deliberations. Indeed, such conduct is not unknown in the sanctum of the United States Supreme Court conference room: “At Conference [Chief Justice Fred Vinson] very seldom raised his voice, but he would filibuster for hours to have his way on a case. One day Frankfurter kept baiting Vinson with barbed taunts. At last Vinson left his chair at the head of the Conference Table, raised his clenched fist *210 and started around the room at Frankfurter, shouting, ‘No son of a bitch can ever say that to Fred Vinson!’ Shay Minton and Tom Clark intercepted Vinson and held him until he had cooled off” (The Court Years — 1939-1975: The Autobiography of William O. Douglas [Random House, 1980], p 226).
The jury in the case at bar deliberated over five days after hearing testimony and voir dire spanning 15 weeks. Sharp differences of opinion and use of obscenities, although not to be encouraged, are a reality of life. Furthermore, the alleged use of epithets, according to the affidavits themselves, this court finds, did not occur until after the verdict. In any event, case law cited above makes clear that such occurrences do not warrant vacatur under the circumstances alleged herein. These are not the type of claims that permit an exception to the prohibition. (See, e.g., Smith v Brewer, 444 F Supp 482.)
The defendant’s next plaint — that the foreman refused to issue a new deadlock note — constitutes commiseration after the fact of a unanimous verdict. Taken alone, it was a discretionary decision on his part that proved to be correct. Viewed as part of defendant’s entire motion, it also fails to lend support to the motion for a new trial. Moreover, the jury, as noted above, was most active in its final day of deliberations in its requests for testimony readback. No juror expressed any belief in the futility of future deliberations.
The defendant’s third contention is that a chair thrown by a juror coerced a verdict. The court has found only one case that ruled on an allegation of a chair being thrown or threats of bodily harm (United States v Kohne, 358 F Supp 1046, supra). There a juror came forward on his own less than one week after the verdict and stated that he had feared that two jurors might break a chair over his head. Such a timely and self-initiated complaint is not present in the instant case. In Kohne, a hearing was held “with considerable reluctance” despite the fact that there was “nothing in [the juror’s] written statement which would warrant impeachment of the verdicts”. (Supra, p 1048.) The Kohne court found that the juror changed his vote in the heat of deliberations and within 11 minutes of his last *211 written request to the court. In the case at bar, the jury returned its verdict five minutes after the final readback of testimony. The Kohne court found that no one picked up a chair or tried to strike the juror. In this case, only one of three jurors’ affidavits alleges that a chair was thrown at a particular person. The People’s and the defendant’s affidavits disclose that the juror who picked up the chair did so out of frustration and thereupon broke down and cried. Defendant’s counsel concedes that the affidavits submitted are sufficient to be determinative of the issues without reference to a hearing. The Kohne court discounted the juror’s assertion that he did not know how to communicate the alleged threats. By the same token, because of the interval between the chair-throwing incident and the verdict that provided the opportunity to protest in court before and after the verdict before the jury was discharged, this court rejects the claim that the jurors could not transmit their fears to the bailiff or the court. They did not see fit to do so until prodded by a representative of the defendant some four weeks to six months later. This court is convinced, therefore, that the subjective reasons why the jurors all joined in the verdict remain inadmissible, and the event complained of is insufficient to warrant a vacatur of the verdict.
The fourth issue raised by the defendant involved the conduct of the court officer in responding to the chair-throwing incident. The allegation is that the officer knocked on the jury room door, entered and told the jury to cease its deliberations. After being assured by the jury foreman that the situation was under control, he left the jury room and the jury resumed its deliberations. It is contended that this conduct violated CPL 310.10 — once the jury has begun its deliberations, court officers are prohibited from speaking with them “[e]xcept when so authorized by the court or when performing administerial duties with respect to the jurors”. It is also defendant’s position that the failure to report the alleged irregularities served to encourage the supposed atmosphere of coercion.
Our Court of Appeals has cautioned that “only in the rarest and most inescapable of circumstances may so-called‘emergencies’ be dealt with other than under the *212 direction of the trial court”. (People v Bouton, 50 NY2d 130, 138.) However, after reviewing the circumstances of the conduct and the relevant case law, it is clear to this court that the prompt inquiry by the officer in response to the loud noise of unknown origin emanating from the jury room was proper and not the object of the statute’s proscription.
In People v Bouton (supra), the conduct condemned was the unauthorized entry by a court clerk into the jury room to retrieve exhibits that had been barred from admission into evidence but had been erroneously delivered to the jury and the clerk’s unauthorized admonition of the jurors for their having scrutinized them. In People v Ciaccio (47 NY2d 431, supra), the unauthorized and coercive statements by the court clerk deprived the defendant of a fair trial. Similarly, in People v Cadby (75 AD2d 713), a hearing was ordered based upon allegations that, while the jury was deliberating, court personnel informed them that they would be sequestered if they failed to reach a verdict. In Parker v Gladden (385 US 363, supra), cited by the court in support of its holding in People v Ciaccio (supra), a murder conviction was set aside because the bailiff assigned to shepherd the sequestered jury had stated in the presence of jurors that the defendant was wicked, was guilty and that any error that may occur in finding him guilty would be corrected by the Supreme Court. These statements, the court held, deprived the defendant of a fair trial by abridging his constitutional rights of confrontation and cross-examination.
The conduct complained of in the present case is clearly distinguishable from that found intolerable in these cases. Here there was no attempt to intrude upon the integrity of the deliberative process. There was merely an attempt to preserve the status quo. When he was assured there was no need for his aid, the officer immediately retreated. This conduct did not adversely affect the jury’s fair and due consideration of the merits of the case. This branch of the defendant’s motion is accordingly denied.
The last complaint in the defendant’s motion refers to alleged note taking by one of the jurors that were brought into the deliberations. The affidavits are facially invalid in *213 that they do not allege who may have made the notes and to what use, if any, they were put. Thus, no prejudice whatsoever may be shown. Moreover, the use of notes falls within the prohibition against impeachment of jury verdicts. (Accord State v Johanson, 332 So 2d 270, 273 [La]; State v Fortenberry, 307 So 2d 296, 300-304 [La]; Commonwealth v Pierce, 453 Pa 319.)
For all the above reasons, the motion to vacate the verdict and judgment is denied.

 The Appellate Division, Fourth Department, disapproved of the conduct of defendant’s counsel in obtaining a juror’s affidavit, citing section 14 of the Civil Rights Law and citing People v De Lucia (20 NY2d 275, 279, supra) for the proposition that our jury system itself is at stake. (People v Streiff, 41 AD2d 259, 272, revd on other grounds 35 NY2d 22.) The procuring of such affidavits and the failure to make timely notice to the court of their existence may in fact conflict with Disciplinary Rule 7-108 (B) of the Code of Professional Responsibility. (See, also, United States v Sanchez, 380 F Supp 1260, affd 508 F2d 388, cert den 423 US 827.)