THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v VINCENT REDD, Appellant.

First Department, November 8, 1990

## APPEARANCES OF COUNSEL

*Terrence J. Sweeney* of counsel (*Peter D. Coddington* with him on the brief; *Robert T. Johnson, District Attorney,* attorney), for respondent.

*Lawrence A. Vogelman (Lawrence J. Reina* with him on the brief), for appellant.

## OPINION OF THE COURT

ELLERIN, J.

At issue in this case is the extent to which a jury's verdict may be impeached by allegations of improprieties during the jury's deliberations.

Almost one month following the return of the jury's verdict finding defendant guilty, one of the jurors, Eleanor Allen, telephoned the defense counsel and told him that she wished to discuss certain improprieties that occurred during the jury's deliberation. Two weeks later, Ms. Allen and another juror, Jerilynn Harris, came to the attorney's office and detailed their allegations in formal affidavits. Based on these affidavits, defendant moved to set aside the verdict. A hearing was then held at which both disaffected jurors elaborated their complaints.

Both jurors claimed that they had voted "guilty" only because of intimidation and coercion by the foreman and other jurors. They also recounted various alleged improprieties. The jurors asserted that they had been threatened by the

foreman, who repeatedly shouted and screamed obscenities at
those jurors who were voting not guilty, escalating to a threat
to throw Ms. Allen out the window. They further stated that
many of the jurors rushed to a verdict on the second day of
deliberations, a Friday, because they did not wish to be
sequestered over the weekend. In fact, Ms. Harris herself was
concerned that she would lose $800 paid for a cruise she was
scheduled to take that weekend. They also testified that they
and some of the other jurors discussed the case during lunch
and other breaks prior to the conclusion of the trial, and that
other jurors were predisposed to find the defendant guilty.

Finally, there was testimony by the two jurors that during
the course of the trial one of the alternate jurors had visited
the crime scene and reported the findings and conclusions of
his examination of the area to several of the other jurors, who
then discussed these observations during the deliberations.

The hearing court denied the motion to set aside the ver-
dict, without extensive comment, noting that the jurors' com-
plaints could have been made to court officers during the trial,
or at the time that the jury was polled.

The basic principle that guides consideration of an applica-
tion such as this is that, absent special circumstances, a jury
verdict should not be impeached by affidavit or testimony of
the jurors after the verdict has been returned. *(See, e.g., People
v De Lucia,* 20 NY2d 275, *overruling* 15 NY2d 294; *cf., People
v Rukaj,* 123 AD2d 277.)

The long-standing rule that statements by jurors may not be
used to impeach a verdict once the jury has been discharged,
reflecting the reluctance of courts to inquire into the process
of deliberation, can be traced to Lord Mansfield's decision in
*Vaise v Delaval* (1 TR 11 [1785]) where the court refused to
consider the affidavits of jurors to prove that the verdict was
reached by the drawing of lots on the ground that "a witness
shall not be heard to allege his own turpitude". The subse-
quent incorporation into the jurisprudence of this country of
the rule against jurors impeaching their own verdict was
based on grounds of public policy. Such proscription was seen
as reducing the risk of jury tampering by protecting the jurors
from harassment by a defeated party seeking to secure evi-
dence which might establish misconduct sufficient to set aside
a verdict. It was also intended to secure the privacy and
secrecy of jury deliberations, to ensure "frankness and free-
dom of discussion and conference". *(McDonald v Pless,* 238 US

264, 268.) Moreover, the rule served to protect the finality and integrity of a verdict and to maintain the viability of the jury as a decision-making body. If all verdicts were assailable, the courts would be caught in a never ending litigation spiral and all notions of finality of judgment would be disregarded. *(People v De Lucia, supra.)*

■ An examination of the various instances of misconduct asserted in the instant case demonstrates the soundness of this approach. Upon careful scrutiny, most of the claims are essentially complaints stemming from escalated tempers and of obscenities shouted by the foreman. In *People v Jacobson* (109 Misc 2d 204, *affd* 89 AD2d 826), allegations that jurors threw chairs and shouted obscenities at one another, were found insufficient to upset the jury's verdict. In this case the alleged threats and belligerent exchanges in the course of deliberations would similarly be insufficient to upset the verdict. Such intense feelings and emotional manifestations often accompany the free and unfettered exchange of views that are the hallmark of the heightened atmosphere in which the jury's decision-making process takes place. To render that process subject to attack by the subsequent impeachment testimony of its participants would, indeed, "create chaos". *(See, People v De Lucia, supra,* 20 NY2d, at 278.)

Nor do the vague and generalized allegations of premature deliberations and predisposed jurors warrant the setting aside of the verdict. No significant details of the alleged premature deliberations were provided and the alleged comments made by other jurors indicating predisposition were isolated remarks which were not shown to have unfairly influenced or prejudiced the deliberative process. Indeed, the two complaining jurors admitted that they were not influenced by these remarks. *(See, People v Horney,* 112 AD2d 841.)

The jurors were polled at the conclusion of the case and affirmed their decision, in open court, without reservation and with no juror giving any indication that the verdict was not freely his or her own. *(Cf., in contrast, People v Pickett,* 61 NY2d 773, 774, *affg* 92 AD2d 843, where upon the polling of the jury, one juror when asked whether the verdict was hers, responded "Yes, under duress, I'm saying yes"; *People v Rukaj, supra; People v Lavender,* 117 AD2d 253, where alleged coercion and other improprieties were brought to the court's attention during the deliberative process. In each of the foregoing cases, the court's failure to hold an appropriate hearing or inquiry, despite communications of alleged coercion

prior to the final rendering of the verdict, resulted in reversal. *See also,* Martin, *Juror Testimony to Impeach Verdict,* NYLJ, June 12, 1987, at 1, col 1 *et seq.)*

In the instant case, since no reservations were in any way expressed by the disaffected jurors before the verdict was rendered, they cannot now be permitted to impugn the finality and integrity of that verdict by belated claims of alleged coercion by other members of the jury.

While the postverdict complaints regarding the tenor and dynamics of the deliberative process, essentially amounting to belated misgivings or second thoughts, are insufficient to overturn the verdict, the situation with respect to the visit to the crime scene is of a different character.

The policy considerations underlying the general rule against impeachment of a jury's verdict must be balanced against a defendant's fundamental right to trial by a fair and impartial jury. In that context, evidence of an "outside influence" on the jury is held to constitute an exception to the general rule. This exception was early recognized in *Mattox v United States* (146 US 140) where jurors read a newspaper article containing opinions about the quality of the evidence and the defendant's guilt during their deliberations and, in addition, comments prejudicial to the defendant were made to them by the bailiff. While acknowledging that jurors could not ordinarily be allowed to impeach their verdict, the Supreme Court held that the general rule should not apply where overt extraneous influences, such as those detailed, were shown to have affected the objective evidence before the jury.

The critical distinction between juror's statements regarding the tenor of jury deliberations and those concerning outside influences, insofar as they relate to possible impeachment of the jury's verdict, was further amplified in *People v De Lucia* (20 NY2d, *supra,* at 279) as follows:

"Where, as in the case of statements regarding juryroom deliberations, every verdict might be rendered suspect, and jurors might become subjected to continuous posttrial harassment, the public policy reasons for holding such statements inadmissible must ordinarily override possible injustice to a defendant, for here our jury system itself is at stake.

"Statements concerning outside influences on a jury, however, occurring less frequently and more susceptible to adequate proof, should be admissible to show that the defendant was prejudiced, for here the danger to our jury system is

minimal compared with the more easily proven prejudice to the defendant. * * *

"Our re-evaluation of the common-law rule that jurors may not impeach their own verdicts reveals that in the case of such inherently prejudical 'outside influences' on a jury as were here present, the violation of the defendants' Sixth Amendment rights outweighs the policy reasons for the rule."

It is clear, therefore, that the statements of jurors may be used to demonstrate that some improper extraneous information or outside influence intruded upon the jury's deliberations to the defendant's prejudice and upon a showing of such prejudice the verdict must be set aside. *(See, People v Brown,* 48 NY2d 388.)

█ Precisely such a showing was made in the instant case. Testimony was presented at the hearing that during the trial, an alternate juror, Mr. Cherry, visited the scene of the crime and made observations concerning the locale. He compared his observations with the physical description of the scene described in the trial testimony with respect to the location of the defendant, his accomplices, and the victim at the time of the alleged crime, and arrived at conclusions regarding the plausibility of the testimony describing the manner in which the shooting occurred. Mr. Cherry reported these observations to several of the jurors the next morning, and these matters were discussed during deliberations.

An unauthorized visit to the alleged crime scene by a juror has been held to constitute inherent prejudice to the defendant since such juror, in effect, becomes an unsworn witness against the defendant in contravention of the defendant's Sixth Amendment rights of confrontation and cross-examination *(see, People v De Lucia, supra; People v Brown, supra; People v Crimmins,* 26 NY2d 319). That in this case the unauthorized visit was made, and reported upon, by an alternate juror in no way lessens its impact. The unauthorized visit and observations of the alternate juror in this case, which were communicated to members of the jury and discussed by them in the course of deliberations, clearly constituted an improper outside influence, since it permitted the jury to focus on matters that were outside the evidence. While the People argue that there is no showing that Mr. Cherry's visit tainted the jury's deliberations, the fact that the jury had before it the uncontradicted report and observations of such visit is all that is necessary. An unauthorized visit to the scene of a

crime, in and of itself, constitutes inherent prejudice to the defendant sufficient to warrant a new trial without proof of how such visit may have influenced individual jurors in their juryroom deliberations. *(People v De Lucia, supra,* 20 NY2d, at 280.)* Accordingly, the judgment herein must be reversed and a new trial ordered.

Judgment, Supreme Court, Bronx County (Solomon Katz, J., at trial; William T. Martin, J., at postconviction hearing and sentence) rendered August 29, 1988, which convicted defendant, after jury trial, of attempted murder in the second degree and sentenced him to a prison term of 6 to 12 years, unanimously reversed, on the law, and the case remanded to the Supreme Court for a new trial.

MURPHY, P. J., CARRO, ASCH and SMITH, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered August 29, 1988, unanimously reversed, on the law, and the case remanded to the Supreme Court for a new trial.