THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DARRYL REID, Defendant-Appellant.
First District (3rd Division)   No. 1—85—2582

Opinion filed August 7, 1991.—Rehearing denied December 17, 1991.

GREIMAN, J., specially concurring.

Karen Daniel, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., John A. Gasiorowski, and Susan J. Crane, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WHITE* delivered the opinion of the court:
Defendant was found guilty in a jury trial of murder and armed robbery and sentenced to concurrent 20- and 9-year terms of imprisonment. This court reversed defendant's convictions on the

---

*Justice White authored this opinion prior to his date of retirement.

ground that the trial court committed reversible error when it failed to answer a question submitted by the jury concerning a point of law on which the jury had not been instructed. (*People v. Reid* (1988), 174 Ill. App. 3d 1009, 529 N.E.2d 590.) This court's decision was reversed by the Illinois Supreme Court, and the cause was remanded to us for consideration of those issues raised in defendant's appeal but not resolved by our earlier decision. (*People v. Reid* (1990), 136 Ill. 2d 27, 554 N.E.2d 174.) The only unresolved issue remaining concerns the effect of an anonymous telephone call received by one of the jurors during deliberations.

The record reveals that the jury's deliberations began on Thursday May 16, 1985. Late Thursday evening, the jury was sequestered for the night in a nearby motel. Deliberations continued all day Friday until 6:37 p.m., when the jury returned verdicts of guilty on both the armed robbery and murder counts. Subsequently, defendant was sentenced to 20 years' imprisonment.

Six days after the sentencing hearing, defendant filed a motion for a new trial alleging that one of the jurors, Kent Bullock, received an anonymous telephone threat while the jury was sequestered at the motel. At the hearing on defendant's motion, Bullock testified that when the jury was sequestered Thursday evening, it was deadlocked 11 to 1 in favor of conviction on the armed robbery count. Bullock further testified that during the bus ride to the motel, the jurors attempted to figure out who the holdout was and that he admitted to another juror that he had voted against conviction.

Bullock testified that, at the motel, he was assigned to a room by himself and that after he had been in the room some time, the telephone rang. Bullock answered the telephone but there was no response. Approximately two hours later the telephone rang again. When Bullock answered it, a male voice said "you son of a bitch, we'll get you for that." Bullock testified that he did not recognize the voice, that he did not report the telephone call to any of the sheriffs sequestered with the jurors, and that he did not report the call to the court.

During deliberations the following morning, Bullock continued to vote for acquittal on the armed robbery count for approximately three hours. Around 11 a.m., Bullock finally changed his vote and a guilty verdict was signed. The jury then began deliberations on the murder charge.

Bullock testified that when the first vote was taken on the murder charge, nine jurors, including himself, were in favor of acquit-

tal. This number eroded during the day and by 6 p.m., only three jurors were in favor of acquittal. Bullock testified that around 6 p.m., after being informed that the judge wanted to see them, the jurors took one last vote, at which time all 12 voted for a conviction on the murder charge.

There was no testimony from Bullock that he connected the phone call with his being the lone holdout on the armed robbery count and he stated that the phone call was not the reason he changed his vote on the murder count late Friday afternoon. However, he also testified in response to a question from the court that the call did cause him to be fearful about his vote and that his desire to avoid having to spend the weekend at the motel was a factor in his decision to change his vote.

During cross-examination by the State's Attorney, Bullock admitted that the defendant's mother was a member of his church and that the church had set up a fund to aid defendant's family. Bullock also testified that he had attended defendant's sentencing hearing and that he had done so out of concern for defendant's mother.

Also testifying at the hearing were Frank Caputo, vice-president of the motel at which the jurors were sequestered; Victor Petriw, a maintenance laborer for the motel; and Andrew Lakatos, one of the sheriffs who was sequestered with the jurors. Caputo testified that it was normal procedure to disconnect the telephones of jurors sequestered at the motel. However, he had no personal knowledge of whether the normal procedure was followed in this case. Petriw testified that on May 16, near the end of his shift, he was instructed to disconnect the telephones in the rooms that were to be used by the jury. According to Petriw, he did this by removing the mouthpieces and earpieces from each of the phones. Petriw also testified that he had no independent recollection of the evening of May 16 and that his testimony was based on an entry in the motel's logbook for that night. Sheriff Lakatos testified that after the jurors arrived at the motel, he checked some of the rooms to make sure the televisions and telephones were disconnected, but he did not check all of them.

At the close of the hearing, the trial court denied defendant's motion for a new trial. The trial court stated that there was no way it could state with confidence that Bullock's phone was disconnected. However, the court held that, based on "what Mr. Bolick [*sic*] testified as occurring and his responses as to what occurred," it could not conclude that the jury's verdict was impeached.

On appeal, defendant argues that the trial court's finding that the telephone call did not result in prejudice was manifestly erroneous. Defendant contends that the telephone call Bullock received was made by one of the other jurors and that the call was directly related to Bullock's being the lone holdout on the armed robbery charge. Defendant further contends that it must be presumed that the telephone call resulted in prejudice. Defendant also argues that the trial court erred in basing its finding of no prejudice on Bullock's testimony about the effect of the call on his deliberations.

■■ Turning first to defendant's argument that Bullock should not have testified about the effect of the phone call on his mental processes, we note that Illinois courts have held that evidence of the effect of outside influences upon the mind of a jury member is inadmissible. (*People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656; *People v. Spice* (1977), 54 Ill. App. 3d 539, 370 N.E.2d 129.) Accordingly, we agree that Bullock should not have been allowed to testify concerning the effect of the phone call. However, we cannot agree that the trial court erred in finding that the verdict was not impeached.

Defendant bases his argument that the telephone call resulted in prejudice on the Supreme Court's decision in *Remmer v. United States* (1954), 347 U.S. 227, 98 L. Ed. 654, 74 S. Ct. 450. There, an unidentified third party contacted one of the jurors in a tax evasion trial, telling the juror that he could profit by bringing in a verdict favorable to the defendant. The juror reported the incident to the trial judge, and the Federal Bureau of Investigation was called in to conduct an inquiry. After it was determined that the statement was made in jest, the trial continued and the defendant was found guilty. Defendant appealed his conviction, arguing that the incident deprived him of a fair trial. Stating that the contact with the juror was presumptively prejudicial, the Supreme Court vacated the conviction and remanded the case for a hearing to determine whether the incident was harmful to the defendant.

We believe that the *Remmer* case is distinguishable. Unlike *Remmer*, where the contact was between a juror and an unidentified third party, here, it is defendant's position that the telephone call was made by a fellow juror upset by the fact that Bullock was holding out on the armed robbery charge. Although we have found no Illinois cases on point, a number of courts in other jurisdictions have held that similar contact did not result in prejudice.

In *United States v. Kohne* (W.D. Penn. 1973), 358 F. Supp. 1046, a juror attempted to impeach a guilty verdict, claiming that

he had joined in the verdict because of threats made by other jurors. The juror testified that at the end of the first day of deliberations, he was the lone holdout against conviction and that, because of the failure to reach a verdict, the jury was sequestered overnight in an hotel. The holdout juror testified that on following day, one of the other jurors stated that if the jury had to spend another night at the hotel he would be in court the next morning for murder. He also testified that a second juror told him "I do not get mad, I just get even." Finally, he testified that two other jurors acted in such a manner that he thought they would pick up a chair and break it on his head because he would not vote guilty. The court found that this testimony, even if true, was insufficient to impeach the verdict.

A similar conclusion was reached in *People v. Keenan* (1988), 46 Cal. 3d 478, 758 P.2d 1081, 250 Cal. Rptr. 550. There, defendant alleged that a juror pointed at the lone holdout, an elderly woman, and shouted "If you make this all for nothing, if you say we sat here for nothing, I'll kill you and there'll be another defendant out there—it'll be me." (46 Cal. 3d at 540, 758 P.2d at 1120, 250 Cal. Rptr. at 590.) There was evidence that, after this outburst, the holdout juror began shaking and crying and became physically ill. Pointing out that heated disagreements between jurors were not uncommon, the court held that even if the threat occurred, it could not conclude as a matter of law that it amounted to prejudicial misconduct sufficient to impeach the verdict.

Finally, in *People v. Jacobson* (1981), 109 Misc. 2d 204, 440 N.Y.S.2d 458, the court rejected a claim that the jury's verdict had been coerced by the action of a juror who threw a chair. The court stated that the alleged contact was insufficient to warrant vacatur of the verdict.

■ In the present case, the trial court apparently accepted Bullock's claim that he received a threatening telephone call; however, the court concluded that the call had no effect on the jury's verdict. We agree with this conclusion.

The alleged threat in this case differs little from those found to be harmless in *Keenan* and *Kohne*, and unlike *Jacobson*, where it was alleged that a chair was thrown, here, there was never any physical act of intimidation. In addition, when the jury was polled in open court, all of the jurors, including Bullock, expressed agreement with the verdict. The complaining juror's failure to speak out when the jury was polled was cited in *Keenan*, *Kohne*, and *Jacobson* as a factor in the courts' refusal to disturb the verdicts.

Accordingly, we find that the telephone call received by Bullock was not sufficient to impeach the verdict and that the trial court did not err in denying defendant's motion for a new trial.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

CERDA, P.J., concurs.

JUSTICE GREIMAN, specially concurring:

I concur with the majority and believe that the judgment of the circuit court should be affirmed.

However, the majority has distinguished *Remmer v. United States* (1954), 347 U.S. 227, 98 L. Ed. 654, 74 S. Ct. 450. The majority suggests that in *Remmer* the contact was between a juror and an unidentified third party while here the defendant argues that the telephone call was made by a fellow juror upset by the fact that Bullock was uncooperative in making a unanimous vote in favor of conviction.

The record does not establish that the alleged telephone call was made by a fellow juror or that, in fact, it had anything to do with Bullock's service as a juror.

I would distinguish *Remmer* for other reasons. In *Remmer*, the court's focus was upon the fact that an FBI agent had been sent in to investigate the juror's conduct in the midst of a trial and that such an investigation was bound to impress the juror and "very apt to do so unduly."

The court observed that "[a] juror must feel free to exercise his functions without the F.B.I. or anyone else looking over his shoulder." *Remmer*, 347 U.S. at 229, 98 L. Ed. at 656, 74 S. Ct. at 451.

The *Remmer* court was also mindful of the trial court's failure to share with the defense the information regarding the contact with the juror although the prosecutor had been made aware of these events.