McCooe, J.P.
(dissenting). I respectfully dissent. The trial court granted plaintiffs’ motion “ordering a new trial based on jurors’ misconduct.” The misconduct relied upon was racial bias, which can be an outside influence permitting the impeachment of a verdict by jurors’ posttrial affidavits. The dissent raises two grounds for reversal. First, there was no proof of the alleged racial bias “intended to deny plaintiffs an award on account of their counsels race” and second, that any jury misconduct was waived.
This is an action seeking the recovery of money damages for defamation and intentional infliction of emotional distress arising in the context of a heated labor dispute. Plaintiffs, the Chinese Staff and Workers Association (CSWA), “an association committed to the protection of workers’ rights in the Chinatown community,” and its executive director, Wing Shung Lam, commenced this action against Jing Fong Restaurant, and its three major shareholders: its president and chairman, Chung-Ko Cheng, its general manager, Shui Ling Lam, and its treasurer, Chun Tsui, as well as the former owner of the restaurant, Richard Chan.
Plaintiffs claimed that defendants had taken tips from its waiters, failed to pay overtime, failed to provide benefits or *543 vacation and fired those who had protested such treatment. Plaintiffs organized a boycott and picketed in front of defendants’ restaurant while supporters of the restaurant held counterdemonstrations. Plaintiffs allege that during this time defendants posted intimidating and threatening posters. The posters warned “workers’ traitors are going to die” and stated that plaintiff Lam, an “evil-hearted,” “bloodsucker,” “slaveholder” and “big Satan,” forced workers to work two jobs, lose their jobs and was destroying the Chinatown economy. During a television interview and at a fundraiser, defendants allegedly referred to plaintiff Lam as “public enemy number 1 in this community” and stated that plaintiff Lam extorted $40,000 from defendant Chan through the Grand Palace Restaurant. The statements regarding extortion were also made in several local Chinatown newspapers and on posters.
Following a 23-day trial the jury began deliberations. On the second day of deliberations, Garrison, the jury foreman, met with the trial judge individually and described some allegations being made in the jury room. This discussion was held off the record and in the absence of the attorneys. Following the meeting, the trial judge had a discussion with the parties and their counsel in which she described a juror’s allegation that Garrison had an “association” with plaintiffs’ counsel, Mr. Alterman; that Garrison had been queried by a juror as to why he smiled at the defendant Tsui; and Garrison stated that the deliberations were not “on track.” The trial judge instructed the jury that there was no association between any juror and any attorney; to deliberate in an orderly fashion; to discuss the evidence and listen to one another; and to put any personal biases against one another aside. The trial judge cautioned the jury that they should be voting on the merits of the case and “not because you want to vote for or against any other member of the jury.” The following day the trial judge again assured the jury that there was not “any connection of any kind with any of the attorneys,” parties, witnesses and any fellow jurors and that if any attorney has “turned them off” it must be “dismissed from their minds.” Again during the lunch break, it appears that Garrison and another juror, Demetrius Daniel, met with the trial judge. Although the substance of these discussions was not disclosed on the record, the trial judge again instructed the jury to listen to one another, not to use abusive language and to allow others to express their viewpoints. The attorneys did not object to the two in camera interviews, did not request a mistrial or hearing on the nature *544 of the in camera jurors’ discussions with the trial judge although the trial judge had given three cautionary instructions to the jury — none of which referred to race. More specifically, there were no references to “racial invectives.”
After three days of deliberations the jury returned a general verdict finding no liability against defendants Cheng, Tsui and Lam, the three officers and shareholders of Jing Fong by a 5-1 vote on each question, Garrison dissenting. The written interrogatories indicated the following. The jury agreed unanimously that Tsui made a defamatory statement against plaintiff Lam, but by a 5-1 vote found that Tsui did not make the statement with reckless disregard of its falsity. The jury found the Jing Fong Restaurant did not make a defamatory statement against the CSWA by a 5-1 margin. The jury unanimously found that Jing Fong Restaurant made a defamatory statement against plaintiff Lam, but by a 5-1 vote found that the statement did not 'injure plaintiffs’ reputation and therefore did not award damáges. The jury found that the former owner Chan had made a defamatory statement against plaintiff Lam, but by a 5-1 vote did not award damages. Finally the jury found that Chan made a defamatory statement against the CSWA, but by a 5-1 vote concluded.that Chan did not make the statement with reckless disregard of its falsity. Therefore, only Jing Fong Restaurant and Richard Chan were found to have made actionable defamatory statements against plaintiff Lam, but no damages were awarded to plaintiffs, again by a 5-1 margin. The jury was polled and each juror attested to his or her vote without objection. The jury consisted of four female jurors, three of African-American and one of Hispanic descent, an African-American male Daniel and a white male Garrison.
Plaintiffs made a motion to set aside the verdict as against the weight of the evidence, impermissibly inconsistent or compromised or, in the alterative, tainted by juror misconduct. In support of the claimed jury misconduct plaintiffs annexed affidavits from two jurors, Daniel and Garrison. Daniel stated that during the trial he was asked by juror number 4 what he thought of plaintiffs’ counsel, Mr. Alterman. He responded that he didn’t believe defendant Tsui. Juror number 3 remarked that “if you can hate Mr. Tsui, then I can hate the attorneys,” apparently referring to Mr. Alterman. Daniel also stated that juror number 5 stated “maybe I’ll go and eat and [sic] Jing Fong and talk to Mr. Tsui.” Other jurors agreed, saying “Oh, yeah, maybe we should all go.” Daniel could not state if the jurors did in fact go to the restaurant. Other jurors referred to *545 Mr. Tsui as “very handsome” with a “nice smile.” Daniel stated that the jury never deliberated, never discussed the claims or the testimony in the case, instead juror number 3 stated she was voting no and nothing could change her mind. Each time the jury foreperson sought to ask each person to discuss their viewpoints, “he was shouted down” by the four female members of the jury. Daniel stated that when he sought to discuss the case and state his opinions he was “shouted down and cursed at because of his beliefs.” When a readback of the testimony allegedly supporting the extortion charge was requested, “the four women jurors refused to consider it” with one remarking “forget it, even if that was the evidence I won’t change my mind.” Daniel stated that the jury never deliberated on the damage to plaintiffs’ reputation, refused to consider records submitted into evidence, and refused to discuss the matter of tips.
According to Daniel, the jury’s verdict was motivated ?hy racial animus. The jury foreperson, Garrison, was called a “motherf * * *” “asshole” and “son of a bitch.” When Garrison attempted to get the deliberations going, juror number 3 stated to the rest of the jury “it’s a white man’s world. That’s why they’re [apparently referring to Garrison and Alterman] * * * in it together.” After the trial judge informed the jury that there was no impermissible relationship between Garrison and Alterman, juror number 3 stated: “You see? He is working with Alterman. He [Garrison] let him [Alterman] know something’s wrong and that’s why he [Alterman] asked for that conference.” During deliberations, when Daniel attempted to intervene in an argument between Garrison and juror number 3, she told Daniel, “f * * * you, f * * * him, f * * * all of you.” Daniel stated that he “thought he was being ganged up on,” felt the “tension and pressure which had definite racial overtone.” Daniel stated that he voted in support of a defendants’ verdict because “he could no longer resist” and “succumbed to the hostility, the pressure and personal attacks.”
Garrison stated in an affidavit that despite the trial judge’s instruction not to discuss the case, “four female jurors, numbers 3, 4, 5, and 6 all of whom were black or Hispanic repeatedly got together and discussed the case” and had “early in the trial” and “prior to hearing the jury charge” decided that plaintiffs had no case. He stated that the claims, evidence and testimony were never discussed, that Garrison was cursed at and referred to as “the white man” and that Daniel was shouted down and called an “Uncle Tom” for attempting to *546 deliberate. Garrison was also accused of impermissibly colluding with plaintiffs’ counsel, apparently based upon an “accusation that [Garrison] had met Alterman in the bathroom for a homosexual encounter.” Finally, Garrison alleges that he attempted to speak with the trial judge for a third time, but was “prevented from doing so by the Court Officer.” Both jurors attest that the verdict was the result of pressure and compromise, with Daniel agreeing with the four remaining jurors that if they voted with him on liability, he would vote with them on damages. The trial court did not direct a hearing on those allegations nor were any affidavits received from the other four jurors. The dissent has given a lengthy factual statement as to the trial judge’s admonitions to the jury and allegations in the affidavits, even those not considered by the trial court or relied upon to set aside the verdict.
In a 24-page decision the trial court granted plaintiffs’ motibii 'tó set aside the verdict on the ground of juror misconduct, denied the branch of the motion seeking a directed verdict and set the matter down for a new trial. The trial court, citing its conversations with Garrison and Daniel during the deliberations and their affidavits, found that despite the court’s admonitions the remaining jurors engaged in a campaign by using racial invectives against Garrison, Daniel and plaintiffs’ counsel “to malign Garrison’s and Daniel’s view of the evidence and to compel conformity with a verdict intended to deny plaintiffs an award on account of their counsel’s race.” This is factually incorrect. The record discloses that the trial court did not admonish the jury on the issue of race and the only references to race are in the jurors’ affidavits as indicated in the dissent’s statement of facts.
The trial court also noted that the “verdict’s inconsistency in form and tenuous relation, at best, to the evidence adduced at trial, compels the conclusion that the verdict was a trade off * * * so tainted by bias * * * [rendering it] impermissible.” In support of the inconsistency, the trial court noted that in its charge it instructed the jury that Jing Fong Restaurant’s liability could only be found vicariously, through the conduct of its employees and corporate officers. Although the jury found that none of the individual corporate defendants made a defamatory statement, it impermissibly found Jing Fong did and thus was inherently inconsistent and irrational. The trial court noted two other inconsistencies: (1) the jury finding that Tsui and Chan made defamatory statements against plaintiff Lam, but only Chan did so with knowledge or disregard of *547 their falsity, despite the testimony that Tsui obtained the information from Chan and, (2) that Chan made a defamatory statement against plaintiff Lam with knowledge of its falsity, but without such knowledge with regard to the CSWA. The trial court also found that the verdict was the result of a compromise, “a verdict on liability in return for * * * no award of damages,” warranting a new trial. Finally, the trial court found that the verdict was against the weight of the evidence, citing the “overwhelming” evidence that plaintiff Lam was defamed by defendants Chan and Tsui resulting in damage to his reputation. Nevertheless the trial court denied the motion for a directed verdict because it was a factual issue for the jury.
Absent special circumstances, the use of posttrial affidavits from jurors to explore the deliberative processes of the jury and impeach its verdict is patently improper (Hoffman v Domenico Bus Serv., 183 AD2d 807 [2d Dept 1992]; People v De Lucia, 20 NY2d 275 [1967]). The policy underlying such a rule is to discourage posttrial harassment of jurors in order to assure the finality of verdicts (People v De Lucia, supra; Kaufman v Eli Lilly & Co., 65 NY2d 449 [1985]) and to secure the privacy and secrecy of the jury deliberations and to ensure frankness, freedom of discussion and conference (People v Redd, 164 AD2d 34 [1st Dept 1990]). In view of this strong public policy, it has been found insufficient to impeach a verdict where a juror alleges that she had been “threatened by the foreman, who repeatedly shouted and screamed obscenities” and even threatened to “throw [the juror] out the window”; where the jurors attested that they and other jurors discussed the case prior to the conclusion of the trial; and that other jurors were predisposed to find the defendant guilty (People v Redd, 164 AD2d at 35-36; see also People v Maddox, 139 AD2d 597, 598 [2d Dept 1988], lv denied 72 NY2d 862 [1988] [allegations of “personal * * * attack(s), harass(ment) and intimidat(ion)” by fellow juror resulting in complaining juror capitulating to a verdict are insufficient to impeach the verdict]; People v Jacobson, 109 Misc 2d 204 [Sup Ct, NY County 1981], affd 89 AD2d 826 [1st Dept 1982], lv denied 57 NY2d 781 [1982] [allegations that jurors threw chairs and shouted obscenities are insufficient to impeach the verdict]). Nor are statements that a juror voted guilty because he “capitulated to the pressure placed on him by other jurors” sufficient to upset a verdict (People v Liguori, 149 AD2d 624, 626 [2d Dept 1989], lv denied 74 NY2d 813 [1989]),“especially in light of his confirmation that it was his verdict upon polling the jury” (People v Goode, 270 AD2d 144, 145 [1st Dept 2000], lv denied 95 NY2d 835 [2000]).
*548 People v Maddox (139 AD2d 597, 598-599 [2d Dept 1988], lv denied 72 NY2d 862 [1988]) reads in part:
“As the Court of Appeals so aptly observed in People v De Lucia (20 NY2d 275, 278 [1967]): ‘The policy reason for the present rule is, of course, that we do not wish to encourage the posttrial harassing of jurors for statements which might render their verdicts questionable. With regard to juryroom deliberations, scarcely any verdict might remain unassailable, if such statements were admissible. Common experience indicates that at times articulate jurors may intimidate the inarticulate, the aggressive may unduly influence the docile. Some jurors may “throw in” when deliberations have reached an impasse. Others may attempt to compromise. Permitting jurors to testify regarding such occurrences would create chaos.’ Thus, in the «absence of allegations regarding ‘outside influences on a jury’ which may have prejudiced the defendant * * * [the] motion was properly denied.”
However an exception to the rule barring juror affidavits to impeach the verdict exists “when the juror’s concern is transmitted to the court prior to the report of the verdict [whereupon] the issue should be investigated * * * when the spectre of an outside influence of the jury affecting defendants’ fundamental right to a fair trial is raised, it is vital that a hearing or other appropriate inquiry be held to ascertain what actually transpired” (People v Rukaj, 123 AD2d 277, 280 [1st Dept 1986]; see also People v Lavender, 117 AD2d 253 [1st Dept 1986], lv granted 68 NY2d 674 [1986], appeal dismissed 68 NY2d 995 [1986]). Outside influences include racial discrimination (People v Rukaj, supra) and bias (Copeland v Town of Amboy, 152 AD2d 911 [4th Dept 1989]). Criminal cases may have a more stringent standard than civil cases for consideration of outside influences (Alford v Sventek, 53 NY2d 743, 745 [1981]).
In People v Rukaj (123 AD2d 277 [1st Dept 1986]) during the course of deliberations the jury sent a note to the judge indicating a verdict could not be reached “because of speculations and biased feelings” (id. at 279 [internal quotation marks omitted]). The court refused to conduct an inquiry into the matter and instead “further highlighted the racial issue by a supplemental charge which was insufficient to appropriately address the issue” (id.). The Appellate Division, First Department, held, “[a]t this point the Trial Judge should have conducted an inquiry *549 into the nature of the jury’s ‘speculations and biased feelings.’ The court had a clear obligation to respond to the jury note and at that juncture should minimally have questioned the jurors * * * At such hearing or inquiry, [the complaining juror] could be examined and cross-examined closely as to the validity of her allegations * * * [with] the [party against whom the biased is allegedly based] and the other jurors having an opportunity to respond. (See, People v De Lucia, supra.) If, after thorough examination, [the complaining juror’s] claim that she was coerced into abandoning her position * * * by reason of another juror’s harassment survives scrutiny and is established, it would demonstrate that invidious racial bias and prejudice permeated this jury’s deliberations so as to deprive this defendant of a fair trial” (id. at 279, 280-281).
There are two grounds for reversal. First, there can be no dispute that the alleged jurors’ conduct, if true, was crude, rude, offensive and completely lacking in civility. Talking trash, disrespecting a person, or putting him or her down may be an acceptable argumentative style in a locker room but not in a jury room. The ridiculous statement that the foreman had a homosexual encounter with the attorney for the plaintiffs in the men’s room was obviously not true but a putdown. It was employed as a tool to win the argument but it does not estáblish a racial bias that affected their vote. People v Rukaj (123 AD2d 277 [1st Dept 1986]) is a case in point. There the racial bias alleged was principally directed against the parties because of their race. There is no such allegation here. The parties are Asians. The remarks were allegedly directed by four women, three African-American and one Hispanic, to two males, one African-American and one white. The white male vote (Garrison) was unaffected and he voted to dissent in spite of the trash talk directed against him in an unsuccessful attempt to change his vote. This was directed at him and not plaintiffs’ counsel. One problem between Garrison and the other four jurors during the deliberations was that they did not want him to be the foreman and this issue was raised on the record. Even assuming that there was a racial bias directed against Garrison, it did not affect his vote or the verdict since he voted for the plaintiffs. The African-American male juror (Daniel) voted with the majority and now claims that his vote was coerced by the remaining four women, principally an African-American juror. The only allegation of racial bias (Uncle Tom) directed against the African-American male was by an African-American woman and its content fails to estab *550 lish a racial bias affecting the result. The verbal interaction between the jurors must be viewed in light of the lengthy trial and deliberations where nerves necessarily became frayed.
Daniel never objected when the jury was polled and his answers to a jury interrogatory sheet comprising 15 pages and 31 questions indicates that he gave consideration to his answers. The fact that Garrison was not coerced is an important factor to consider when deciding if Daniel’s vote was coerced. Garrison, who had already twice spoken with the trial judge about his fellow jurors, did not make any objection to the trial judge after the verdict nor did the trial judge direct an immediate hearing nor did the plaintiffs’ attorney make such a request.
Furthermore the record establishes that the jury deliberated for three days during which there were readbacks of the testimony including readbacks requested by jurors other than the foreman. Contrary to the jurors’ affidavits, there is no showing that the four female jurors did not decide the case on the merits or that they were biased against any party or that bias affected the result. The diverse answers to the interrogatories show that they gave consideration to the evidence. For the foregoing reasons, the jurors’ blunderbuss affidavits which were handcrafted by the attorneys should not have been allowed to impeach the jury verdict since there was no outside influence shown that affected the result, only speculation. The trial court stated that it did not consider the claims in the jurors’ affidavits regarding “premature discussion,” “failure to deliberate” and “vulgar or belligerent speech” in reaching its determination. In view of the length of the jurors’ deliberations, the questions from the jurors and the number of read-backs, this is understandable. There is no showing that the jurors’ verdict was affected by an “outside influence” (People v Redd, 164 AD2d 34 [1st Dept 1990]).
The second ground for reversal is waiver. Both parties had the right to object to the two separate in camera interviews by the trial judge. It is a fundamental legal principle that parties chart their own procedural course, whether during motion practice or at trial. Neither attorney objected to the improper procedure even after the trial court gave three cautionary instructions. If they were present, they would have known what is claimed to have taken place in the jury room. People v Rukaj (123 AD2d 277 [1st Dept 1986]), the authority principally relied upon by the majority, is distinguishable- since the jurors’ note was read in open court and a motion for a mistrial was *551 immediately made and denied.
The footnote in the majority opinion states that there is “no indication” that the attorneys knew of the substance of the interviews. There is no dispute that the attorneys at least knew what is contained in the three cautionary instructions to the jury and made no objection or request for a mistrial. Whether there were also off the record discussions with the attorneys is unclear from the record. Point III of plaintiffs-respondents’ brief advances the argument that “Appellants had ample notice * * * that the jury was infected with racial hostilities” and “failed to followup” by asking the trial judge for specifics. This same argument applies to respondents. The failure to object constitutes a waiver. Parties cannot wait until after an unfavorable verdict and then object (Califano v City of New York, 212 AD2d 146, 153 [1st Dept 1995]).
The trial court in its decision discusses other grounds for setting aside the verdict but relies only upon the ground previously discussed: juror misconduct based upon racial animus. Nevertheless, the dissent will address those grounds.
There is no showing that the verdict was contrary to the weight of the evidence. This case presented credibility issues which the jury resolved in favor of the defendant and an appellate court must view the evidence in the light most favorable to the prevailing party (Alexander v Eldred, 63 NY2d 460, 464 [1984]). The correct standard in making such determination is whether the jury could have reached their conclusion upon any fair interpretation of the evidence. The trial court decision discusses this standard concluding with the incorrect statement that “the Court must discern whether, based on the evidence, ‘any valid line of reasoning and permissible inferences’ could possibly lead rational persons to the conclusion reached by the jury” (Kennedy v New York City Health & Hosps. Corp., 300 AD2d 146 [1st Dept 2002]). The trial court’s finding that the verdict is contrary to the weight of the evidence is based largely on “the grounds alleged to constitute juror misconduct.” There was a rational basis for the jurors’ verdict (370 Hamilton Ave. Corp. v Allied Outdoor Adv., 258 AD2d 517, 518 [2d Dept 1999]).
Initially it should be noted that the plaintiffs have waived the issue of inconsistency by failing to object prior to the discharge of the jury (see, Newman and Ahmuty, Jr., Appellate Practice, Review of Inconsistent Verdicts, NYLJ, Jan. 18, 1994, *552 at 3, col 1).* The parties stipulated to “waive all post-trial motions * * * in accordance with Article 44 of the CPLR.” Inconsistent verdicts are governed by CPLR 4111 (c) and it is the rule relied upon by respondents. While this issue could be decided on waiver and would be determinative, the inconsistency issue will be considered (Telaro v Telaro, 25 NY2d 433 [1969]). The reason for its consideration is that it might incorrectly be seen to affect the “interests of justice” argument.
The trial court found that the verdict was inconsistent in part because the allegedly biased jury found the corporate defendant liable in the written interrogatories but found the named individual corporate officers not liable for uttering defamatory statements in separate interrogatories. Any inconsistency must be viewed “in the context of the court’s charge” to the jury (Rubin v Pecoraro, 141 AD2d 525, 526 [2d Dept 1988]). The trial court’s charge refers on numerous occasions to the “Jing Fong defendants” and states that the plaintiffs claim these defendants “displayed many defamatory statements * * * posters and placards at the restaurant, and handed out many defamatory leaflets to passersby and persons demonstrating against plaintiffs * * * You’ve heard testimony that defendant Jing Fong Restaurant’s employees or officers including its. treasurer Chun Tsui, made the posters and placards that you have seen and heard about. Even though you find that an act of an employee or officer was reckless or intentional, Jing Fong Restaurant is nonetheless responsible for plaintiffs’ damages if you find that the employee or officer was acting in furtherance of the employers’ business and within the scope of his authority.” The trial court found an inconsistency because “the evidence revealed no defamatory statements by restaurant employees, however, that were not at an officer’s behest.” This requirement of an employee acting at the direction of an officer was not charged to the jury (People v Tucker, 55 NY2d 1, 8 [1981]).
It is also not established that the interrogatories were “irreconcilably inconsistent” (Boscorale Operating v Nautica Apparel, 298 AD2d 330, 331 [1st Dept 2002]). Furthermore, “[w]here the verdict can be reconciled with a reasonable view of the evidence, the successful party is entitled to the presumption that the jury adopted that view” (Koopersmith v General Motors Corp., 63 AD2d 1013, 1014 [2d Dept 1978], lv denied 46 NY2d 705 [1978]).
*553 CPLR 4111 (c), entitled “General and special verdicts and written interrogatories,” is controlling. It states in pertinent part: “(c) General verdicts accompanied by answers to interrogatories * * * When the answers are inconsistent with each other and one or more is inconsistent with the general verdict, the court shall * * * order a new trial.”
Assuming arguendo that the two interrogatories are inconsistent with each other, neither is inconsistent with the general verdict. Since in a separate interrogatory the jury found no injury to plaintiffs from the defamatory statement by the corporate defendant and no damages, it cannot be shown that it is inconsistent. Assuming it is, this would have no effect on the result. Pragmatically since the jury found no damages, the error claimed in the interrogatory would have no legal effect. Considering the charges and counter charges between the parties in the context of a heated labor dispute, the finding of no damages is not surprising. There is no showing that the jury was “utterly confused” (Vera v Bielomatik Corp., 199 AD2d 132, 133 [1st Dept 1993]). The trial court’s decision denying a directed verdict articulates reasons why the trier of facts could have found no liability or damages, principally that it is a credibility issue for the trier of the facts.
There is no legal basis to set aside the verdict “in the interest of justice” (CPLR 4404 [a]). “The question for resolution for such a motion is ‘whether substantial justice has been done [or] whether it is likely that the verdict has been affected’ ” (Califano v City of New York, 212 AD2d 146, 153 [1st Dept 1995] [citation omitted]). The fact a trial court might disagree with the jury is not a sufficient basis (Johnson v New York City Health & Hosps. Corp., 246 AD2d 88, 94 [1st Dept 1998]). The remaining arguments have been considered and found lacking in merit.
In summary, the racial bias necessary to constitute the outside influence necessary to impeach a verdict in a civil case by posttrial affidavits has not been shown. The trash talk did not reflect a racial bias nor did it affect the verdict.
Furthermore, the plaintiffs waived their right to raise this issue by not objecting to the two in camera meetings or after the judge’s subsequent remarks to the jury, particularly when it was made known by the judge that there were problems among the jurors. Whether they knew or did not know precisely what was said is not controlling. They are charged with knowledge as to what they should have known if they were present.
A party cannot wait until after it receives an unfavorable result before objecting.
*554 The verdict was not inconsistent with the charge, and in any event the plaintiffs waived their right to object. The verdict was not “irrational.” It was the result of long deliberations and extensive readbacks which reflected a serious consideration of the issues.
The verdict was erroneously set aside and should be reinstated.
Gangel-Jacob and Schoenfeld, JJ., concur; McCooe, J.P., dissents in a separate opinion.

 A critique of Vera v Bielomatik Corp. (199 AD2d 132, 133 [1st Dept 1993]) relied upon by the majority.